IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY SCOTT, ) | |
|          Plaintiff, ) | |
| v. ) | NO.   07 C 3684 |
| ) | |
| CITY OF CHICAGO, OFFICER JOHN FASSL, ) | |
| OFFICER AL ALMAZAN, OFFICER STEVE ) | |
| BROWNFIELD, OFFICER EDWARD NICOL, ) | |
| and OFFICER LARRY THOMAS, ) | |
|          Defendants. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATMENT OF FACTS**

NOW COMES the Plaintiff, LARRY SCOTT, by and through his attorney, BASILEIOS J. FOUTRIS, and, in response to the Defendants' Local Rule 56.1 Statement of Facts, provides as follows:

1. On June 29, 2007, plaintiff, Larry Scott ("Scott"), filed a four-count complaint alleging United States constitutional violations against five Chicago police officers - John Fassl ("Fassl"), Al Almazan ("Almazan"), Steve Brownfield ("Brownfield"), Edward Nicol ("Nicol") and Larry Thomas ("Thomas"). Two counts are brought pursuant to 42 U.S.C. Sec. 1983 for coerced confession and conscience shocking behavior and two state court claims are brought for malicious prosecution and indemnification. (Exh. 1).

**RESPONSE**:      Admit.

2. On December 9, 2008, a Stipulation was entered dismissing with prejudice, defendant officers Edward Nicol and Larry Thomas. (Exh.2).

**RESPONSE**:      Admit.

3. At all times relevant defendant officers Fassl, Almazan and Brownfield were employed by the City of Chicago as sworn police officers and acting under the color of law. (Exh.3, Fassl Dep.p8.; Exh.4, Almazan Dep.p.7; Exh.5, Brownfield Dep. pp.7, 11).

**RESPONSE**:      Admit.

4. Plaintiff was a resident of Illinois at the time of his arrest. (Exh.6, Scott Dep. pp.15, 16; Exh.9, Norbut Dep.p.19).

1

**RESPONSE**: Admit.

5. Brownfield was assigned to investigate the August 3, 2000, murder of Jesus Villalobos. (Exh.5, pp.35, 36, 57, 59).

**RESPONSE**: Admit.

6. Estella Gonzalez, a lady who cleaned for Mr. Villalobos, discovered the body on August 3, 2000. (Exh.5, pp.45, 74, 75).

**RESPONSE**: Admit.

7. Jeff Blankenship, a confidential informant ("CI"), for Officers Nicol and Thomas, without being promised anything in exchange for information, told the officers who knew nothing about Villalobos' death, that Scott was the offender in the homicide of Villalobos and described the relationship Scott and Villalobos had. (Exh.7, Nicol Dep. pp.16-17, 30, 40, 41, 46, 52, 54, 59 ; Exh.8, Thomas Dep. pp.22, 23, 35, 36, 39, 40).

**RESPONSE**: The Plaintiff denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The record establishes that Blankenship was paid by Chicago police officers for his tips – some of which were good and some of which were bad. (See Plaintiff's Additional Facts In Response to Defendants' Motion for Partial Summary Judgment, Paragraph 4). In addition, the Defendants imply that Blankenship was forthcoming with the officers. He was not. The record establishes that he refused to explain how he knew Scott was involved in the murder. (Plaintiff's Additional Facts, Par. 4). Further, the Defendants fail to include the facts that establish that Blankenship was not credible, including that he: was a heroin addict that sold drugs, was a known burglar, and was a known criminal in the Chicago police department's District 5. (Plaintiff's Additional Facts, Par. 4).

8. Plaintiff knew Blankenship since they were about 10 or 11 years old. Plaintiff had last seen Blankenship around the time of Villalobos' death. (Exh.6, pp.269, 270).

**RESPONSE**: Admit.

9. After receiving this information, Officers Nicol and Thomas returned to their district station to look for information on Larry Scott and the murder Blankenship had just informed them about, recording the information on a police report. (Exh.7, pp.38-39; Exh.8, pp.23, 24).

2

**RESPONSE**: Admit.

10. After being advised about the information by Nicol and Thomas, Brownfield submitted a Chicago Police Department "stop order" indicating to police officers that Chicago police detectives wanted to interview Scott regarding a homicide. (Exh.5, pp.107-110).

**RESPONSE**: The Plaintiff denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The record establishes that the "stop order" expressly stated that there was no probable cause to arrest Scott. (Plaintiff's Additional Facts, Par. 3). The Plaintiff admits the remaining facts in this paragraph.

11. At approximately 3:24 p.m. on October 2, 2000, Scott, using the alias of Paul Ciesiun, was arrested by Officer Kenneth Norbut of the Chicago Ridge Police Department for retail theft at the Kohl's Department Store and brought to the Chicago Ridge Police Station to be processed. (Exh. 9, Norbut Dep. pp.14,16,17, 21 w/ dep. exhibits).

**RESPONSE**: The Plaintiff denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The cited record clearly establishes that Larry Scott did not provide Officer Norbut the alias Paul Ciesiun. The Plaintiff admits the remaining facts in this paragraph.

12. Because a "stop order" was issued for Scott by the Chicago Police Department, Officer Norbut notified the Chicago Police that Scott was arrested and in their custody. (Exh.3, pp.121,122,127; Exh.9, pp.19, 20, 23, 24).

**RESPONSE**: Admit.

13. At about 10:45 p.m. Scott was released by the Chicago Ridge Police Department on a Recognzance Bond. (Exh.9, pp. 14, 15, 26).

**RESPONSE**: Admit.

14. Before his October 2, 2000 arrest by the Chicago Ridge Police, Scott had taken heroin at about 6:00 a.m. (Exh.6, p.65).

**RESPONSE**: Admit.

15. Although Scott did not graduate from a high school, he received his GED in approximately 1980 and took a college level examination program (CLEP) to take college level courses while he was serving in the United States Army and read books on mathematics and physics, Stephen Hawkins and Heisenberg while he was incarcerated. (Exh.6, pp.17, 72-75, 237).

3

**RESPONSE**: The Plaintiff admits the facts stated in the paragraph, but denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The Defendants are implying that the Plaintiff is highly intelligent given the material he has read. Dr. Pasulka, who evaluated the Plaintiff over the course of two days, found that the Plaintiff's IQ is 109 – which is in the average range – and that in many aspects, including math ability, math calculation, arithmetic, and Letter-Number Sequencing, the Plaintiff has below average and low average intelligence. (See Pasulka Deposition, attached hereto as Exhibit 1, p. 48; Pasulka Psychological Evaluation, attached hereto as Exhibit 2, p. 10-11, 14).

16. Upon Scott's release, Detectives Fassl and Almazan picked Scott up from the Chicago Ridge Police Station and brought him to Area Two of the Chicago Police Department for questioning about the August 3, 2000, murder of Jesus Villalobos ("Villalobos"). (Exh.3, pp.115-118, 121-123).

**RESPONSE**: Admit.

17. Scott admitted he knew Villalobos as "Jefe", and told the detectives he sold stolen clothes and guns to Villalobos but denied involvement in Jefe's murder after Almazan threw a picture of the decedent onto the table for Scott to look at. (Exh.6, pp.52-54, 58, 139-141, 222, 241).

**RESPONSE**: Admit.

18. When Fassl questioned Scott and Scott admitted to knowing Villalobos and knowing Villalobos was murdered but denying he killed Villalobos, Almazan responded according to Scott with "Bullshit. This is your f'ing work" and showed Scott a photograph of the deceased laying on the floor with an open shirt revealing stab wounds to the chest. (Exh.6, pp.137-141).

**RESPONSE**: Admit.

19. Fassl intentionally built up a rapport with Scott by discussing ancient Greeks, Samarians, the German philosophers, including Nietzsche and questioned Scott multiple times without Almazan present, Almazan having been involved in only two interviews of Scott. (Exh.3, pp.51, 155, 160, 198, 199, 203, 208, 271, 272; Exh.4, pp. 97-100, 112, 113, 129, 133, 152; Exh.6, pp.72-75,160-162, 169, ).

**RESPONSE**: The Plaintiff denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The record establishes the Almazan was either present for all the interviews, was present for three interviews while being informed about the

4

others, or was present for two of the interviews while being informed about the others. In particular, the very first time Fassl testified under oath regarding this matter he testified that Almazan was present for all of the interviews that he had with the Plaintiff. (See 6-25-01 preliminary hearing testimony of Fassl, attached hereto as Exhibit 3, p. 13-16). In addition, the record indicates that Almazan was "involved" in all of the interviews, irrespective of whether he was actually present. The collective record also establishes that Almazan was present for at least three of the interviews – including, according to Almazan, being present when the Plaintiff was providing his statement to Fassl in Area 2 after they returned from Villalobos' apartment – and that he was informed about the other interviews as he "collaborated" with Fassl and Brownfield regarding what the Plaintiff said. (See Almazan deposition, attached hereto as Exhibit 4, p. 217; Plaintiff's Additional Facts, Par. 7, 13, 16, 25).

20. Prior to the first interview on October 2, 2000, that lasted approximately thirty minutes, Scott was given his <u>Miranda</u> rights. (Exh.3, p.145, Exh.4, p.88).

**RESPONSE**: Deny. It is disputed whether the Miranda rights were ever read to Scott. Scott clearly and unambiguously has testified that he repeatedly asked for a lawyer every single time that he was questioned, that his requests were ignored every single time (just as if the question was never asked), and that he was never Mirandized by Fassl, Almazan or Brownfield. (See Plaintiff's Additional Facts, Par. 8, 15, 17, 36). The Plaintiff admits that the first interview lasted approximately 30 minutes.

21. In the October 2, 2000 interview Scott told Fassl that he was a heroin addict and stole clothes ("boosted") to pay for his drug habit. (Exh.3, p.177).

**RESPONSE**: The Plaintiff admits that the facts in this paragraph are true, but denies that it is a complete statement of what the Plaintiff said during this interview regarding his heroin addiction, his drug habit, or his medical condition. (See Plaintiff's Additional Facts, Par. 8).

22. Scott believes Fassl questioned him two times on the first day, walking out and returning five minutes later while Almazan left Fassl in the room alone with Scott walking in and out. (Exh.6, 162).

**RESPONSE**: The Plaintiff admits that the portion of the deposition cited in this paragraph is accurately cited, but denies that this paragraph accurately characterizes the record. The Plaintiff's deposition, taken as a whole and in context, plainly establishes that the Plaintiff was describing the fact that he was taken to the

5

interrogation room, he was uncuffed, he asked the Detectives what was going on, the detectives told him they would be right back, they closed the door, they locked it, they returned five minutes later and began questioning him about the murder. (See Plaintiff's deposition, attached hereto as Exhibit 5, p. 135, 137-141).

23. Scott never indicated to Fassl that he felt like he was going to vomit nor did Scott vomit in the defendants' presence, however, after Fassl and Almazan left for the night Scott vomited. (Exh.3 p.156, 157; Exh.6, p.171).

**RESPONSE**: The Plaintiff admits that the portion of the depositions cited in this paragraph are accurately cited, but denies that this paragraph accurately characterizes the record. The record clearly establishes that during this first interview, the Plaintiff informed Fassl and Almazan that he was sick, specifically stating that he was a heroin addict, that he had been using heroin for 20 years, that he still used heroin as of October 2000, that he was beginning to go through heroin withdrawal, and that he needed medical attention. (See Plaintiff's Additional Facts, Par. 8). It also clearly establishes that he told every officer he encountered at Area 2 that he needed medical attention, providing his entire medical history in the process. (See Plaintiff's Additional Facts, Par. 37).

24. When Scott saw Fassl the following morning he did not tell Fassl he needed to use the bathroom. (Exh.6, p.165).

**RESPONSE**: Deny. In the portion of the record cited by the Defendants the Plaintiff provided the exact opposite as he explicitly testified that he did ask Fassl to use the bathroom. In particular the Plaintiff was asked the following question and gave the following answer during his deposition:
> "Q: At any time, let's say, within the first 60 minutes of – you know, I keep calling him doctor – when Detective Fassl has come back and he's on another shift, did you say that you needed to use the bathroom?
>
> A: Yes."

(See Defendants' citation; see also attached Exhibit 5, p. 165).

25. The second and third interviews of Scott took place on October 3, 2000 after Fassl read Scott's Miranda warnings to him. (Exh.3, p.173, 174).

**RESPONSE**: Deny. It is disputed whether the Miranda rights were ever read to Scott. Scott clearly and unambiguously has testified that he repeatedly asked for a lawyer every single time that he was questioned, that his requests were ignored every single time (just

6

>as if the question was never asked), and that he was never Mirandized by Fassl, Almazan or Brownfield. (See Plaintiff's Additional Facts, Par. 8, 15, 17, 36). The Plaintiff admits that Fassl's second and third interviews of the Plaintiff did occur on October 3, 2000.

26. Scott did not tell Fassl he was going through heroin withdrawal nor did he ask for an attorney on October 3, 2000. (Exh.3, pp.173, 175).

**RESPONSE**: Deny. Scott clearly and unambiguously has testified that he repeatedly asked for a lawyer every single time that he was questioned and that his requests were ignored every single time (just as if the question was never asked). (See Plaintiff's Additional Facts, Par. 15, 36). The record also establishes that the Plaintiff did discuss with Fassl his heroin withdrawal, his heroin habit, as well as his other conditions, on October 3, 2000. (See Plaintiff's Additional Facts, Par.15, 23, 37)

27. Scott claims not to have seen Almazan on the second day, October 3, 2000. (Exh.6, p.169).

**RESPONSE**: Deny. The cited portion of the record does not provide that the Plaintiff did not see Almazan on October 3. Further, the Defendants are mischaracterizing the record in this case, and the Plaintiff denies that the Defendants are accurately citing the record in the light most favorable to the Plaintiff. The record establishes that, according to Fassl, Almazan was present for all of the interviews with the Plaintiff – including the ones on October 3, 2000. (See Exhibit 3, p. 13-16). The collective record also establishes that Almazan was present for at least three of the interviews with the Plaintiff, including at least one of the interviews on October 3, 2000. (See Exhibit 4, p. 217; Plaintiff's Additional Facts, Par. 13).

28. Almazan's experience with heroin withdrawal symptoms comes from flop houses and he believed the symptoms consisted of vomiting, body cramps and a lot of pain. (Exh.4, pp.49-52).

**RESPONSE**: The Plaintiff admits that the portion of the depositions cited in this paragraph are accurately cited, but denies that this paragraph accurately characterizes the record as it is an incomplete statement of facts. The complete record establishes that, as of October 2, 2000, Almazan: had training regarding drug addiction; had seen people go through heroin withdrawal several times while on the job; had also seen a friend go through heroin withdrawal; knew that people going through withdrawal had cramps, a lot of pain, and "overall sickness" that includes vomiting; and knew that

7

          methadone helped people that were going through withdrawal. (See Plaintiff's Additional Facts, Par. 10).

29. Scott has no knowledge that Almazan participated in the coerced statement or even if Almazan knew plaintiff was coerced into giving a statement. (Exh.6, pp.216, )

**RESPONSE**: Objection on the basis that there is no foundation to establish that the Plaintiff has personal knowledge regarding all of Almazan's acts regarding the coerced confession. Further answering, the Plaintiff denies that the Defendants are accurately citing the record. The cited portion of the record indicates only that the Plaintiff does not know if Almazan was aware of the coerced confession. The facts in the light most favorable to the Plaintiff establish that Almazan actually did know about the coercion since he was present for at least three of the interviews – including, according to Almazan, being present when the Plaintiff was providing his statement to Fassl in Area 2 after they returned from Villalobos' apartment – and that he was informed about the other interviews as he "collaborated" with Fassl and Brownfield regarding what the Plaintiff said. (See Exhibit 4, p. 217; Plaintiff's Additional Facts, Par. 7, 13, 16, 25).

30. Almazan never told Scott what to say in his statement. (Exh.6, p.217).

**RESPONSE**: Admit.

31. Brownfield never conducted any interrogation or question Scott about the Villalobos murder other than to ask Scott to sign a consent form for a buccal swab and to transport Scott to the polygraph examiner's office. (Exh.5, pp.26, 30, 31, 35, 116, 117; Exh.6, pp.147-151).

**RESPONSE**: Deny. The Plaintiff clearly and unambiguously testified that Brownfield questioned him twice about the murder, and he also testified that the officer that actually took the buccal swab was the one that had him sign the consent form, an officer that he never saw again. (See Plaintiff's Additional Facts, Par. 17, 18; Exhibit 5, p. 156-158). Further answering, the Plaintiff admits that Brownfield and his partner took the Plaintiff for the polygraph exam.

32. Scott did not know it was Brownfield who asked him to give a buccal swab. (Exh.6, pp.155,156).

**RESPONSE**: The Plaintiff denies that this is an accurate statement of the cited record, and deny that it is undisputed. In the cited portion of the

8

        record, the Plaintiff remembers that the officer that asked him to take the buccal swab was the one that actually took the sample. (See Exhibit 5, p. 156-158). In addition, the record indicates that, according to Fassl, Fassl was the person that asked the Plaintiff to take the buccal swab. (See Fassl deposition, attached hereto as Exhibit 6, p. 176).

      33.    Brownfield was never verbally abusive to Scott. (Exh.6, pp.156-158).

**RESPONSE**:      Admit.

      34.    On October 4, 2000, Fassl and Almazan took Scott to Villalobos' apartment, and Scott and Fassl while alone discussed the facts as to how the murder occurred; Scott claiming that Fassl inferred that Scott would receive medical care for a statement. (Exh.3, pp. 232-242; Exh.6, pp.200, 201, 204-209, 217).

**RESPONSE**:      The Plaintiff denies that the Defendants are accurately or completely characterizing the record and deny that the Defendants are characterizing the record in the light most favorable to the Plaintiff. Further, the Plaintiff denies that he "discussed the facts of how the murder occurred in the apartment" or that Fassl simply "inferred that Scott would receive medical care". According to the record, after Scott was verbally abused and berated by either Detective Dougherty or Haras while he was handcuffed in the apartment, Fassl pulled Scott aside and described to him how the murder occurred. (See Plaintiff's Additional Facts, Par. 30, 31). According to the record, at that point Scott denied any involvement, again pleaded for medical attention, and explained the danger he faced due to the infection and endocarditis – to which Fassl responded that he would help Scott if Scott helped him and said, "if you give me what I want, I'll give you what you want." (See Plaintiff's Additional Facts, Par. 31, 32). The record establishes that the Plaintiff never actually confessed in the apartment. (See Plaintiff's Additional Facts, Par. 32).

      35.    After Assistant State's Attorney Jim Papa explained to Scott that there were four ways to memorialize a statement, Scott chose to give his statement via video tape upon his return to Area Two. (Exh. 10, ASA Papa Trial Testimony, pp. 132-134, 136-138, 140).

**RESPONSE**:      The Plaintiff denies that the Defendants accurately characterize the record, and denies that he "chose" to give a video statement. Instead, the record establishes that Fassl told the Plaintiff that he had to give a video statement before Papa arrived. (See Plaintiff's Additional Facts, Par. 33).

9

      36.    Before giving the taped confession, Scott spoke to ASA Papa alone and did not tell ASA Papa that he was mistreated or promised medical attention in exchange for a confession. (Exh.6, pp. 212, 213; Exh.10, pp.134, 135-138).

**RESPONSE**:      The Plaintiff denies that the Defendants accurately characterize the record, and denies that he gave only one videotaped statement, which this paragraph implies. The record establishes that the Plaintiff provided two videotaped statements. (See Plaintiff's Additional Facts, Par. 33). Further, the record establishes that the Plaintiff spoke to Papa alone only after Fassl made it clear that Papa was working with Fassl, and while under the belief that if he told Papa anything about what had happened that his deal with Fassl to provide a statement in exchange for medical treatment would be voided. (See Plaintiff's Additional Facts, Par. 34). Further answering, the Plaintiff admits that he did not tell Papa that he was mistreated or promised medical attention in exchange for a confession.

      37.    ASA Papa read Scott's <u>Miranda</u> rights to him, which Scott understood, waiving his rights before giving a video-taped statement. (Exh.6, p.234; Exh. 10, pp. 129-131,135-138; Exh.11, video-taped confession).

**RESPONSE**:      The Plaintiff denies that the Defendants accurately characterize the record, and denies that he gave only one videotaped statement, which this paragraph implies. The record establishes that the Plaintiff provided two videotaped statements. (See Plaintiff's Additional Facts, Par. 33). Further, answering, the Plaintiff admits that in the one videotape provided to the Court the Plaintiff was read his Miranda rights and indicated that he understood those rights.

      38.    When Scott gave his video-taped confession he does not believe his heroin withdrawal symptoms were obvious to a person who does not know the symptoms of withdrawal. (Exh.6, p.185).

**RESPONSE**:      The Plaintiff denies that the Defendants accurately characterize the record, denies that he gave only one videotaped statement (which this paragraph implies), and denies that he was not suffering from withdrawal at the time (which this paragraph implies). The record establishes that the Plaintiff provided two videotaped statements. (See Plaintiff's Additional Facts, Par. 33). Further, answering, at the time that the Plaintiff gave his videotaped statements, he had defecated on himself, he was nauseous, he was sweating, he had chills and hugged himself, he was jittery and he had goose bumps. (See Exhibit 5, p. 184-186; Plaintiff's Additional Facts, Par. 13). Also, the symptoms were not obvious because the Plaintiff had the

>ability to suppress, or mask, his symptoms for short periods of time – something that heroin addicts are capable of doing when they believe that doing so will help them alleviate the symptoms. (See Ciesiun deposition, attached hereto as Exhibit 7, p. 39-40, 42, 107; Hargan deposition, attached hereto as Exhibit 8, p. 76-77). Further answering, the Plaintiff stated that a person present for the videotaping would know that he was going through withdrawal. (Exhibit 5, p. 242).

39. Although on or about June 30, 2006, the Illinois Appellate Court reversed the convictions and remanded for a new trial in which Scott's statements would be suppressed it did not make a finding that Plaintiff's statement was coerced. (Exh.12, Illinois Appellate decision).

**RESPONSE**: Admit.

40. The Cook County State's Attorney's office did not proceed with a new trial against Scott because the Illinois Appellate Court suppressed the statement and the State moved for nolle prosequi on March 8, 2007. (Exh. 13, Transcript of criminal court proceedings).

**RESPONSE**: The Plaintiff denies that the Defendants accurately state the reason that the Cook County State's Attorney's office did not proceed with a new trial. The record establishes that, to date, there has never been any evidence, other than Scott's confessions, that point to Scott as the murderer. (Plaintiff's Additional Facts, Par. 40).

Respectfully submitted by,

s/Basileios J. Foutris
BASILEIOS J. FOUTRIS
Attorney for Plaintiff
FOUTRIS LAW OFFICE, LTD.
53 West Jackson, Suite 252
Chicago, Illinois 60604
312-212-1200

**CERTIFICATE OF SERVICE**

The undersigned, attorney of record herein, hereby certifies that on February 12, 2010, the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATMENT OF FACTS** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, along with judge's courtesy copies being delivered; which will send notification of such filing to: Arlene Esther Martin at amartin@cityofchicago.org, Matthew Raymond Hader at matt.hader@cityofchicago.org, Anne Katherine Preston at apreston@cityofchicago.org and George John Yamin, Jr. at gyamin@cityofchicago.org.

        s/ Basileios J. Foutris
        BASILEIOS J. FOUTRIS
        Attorney for Plaintiff
        FOUTRIS LAW OFFICE, LTD.
        53 West Jackson, Suite 252
        Chicago, Illinois 60604
        312-212-1200