IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY SCOTT, ) | |
|           Plaintiff, ) | |
| v. ) | NO. 07 C 3684 |
| ) | |
| CITY OF CHICAGO, OFFICER JOHN FASSL, ) | |
| OFFICER AL ALMAZAN, OFFICER STEVE ) | |
| BROWNFIELD, OFFICER EDWARD NICOL, ) | |
| and OFFICER LARRY THOMAS, ) | |
|           Defendants. ) | |

**PLAINTIFF'S ADDITIONAL FACTS IN REPSPONSE TO THE DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES the Plaintiff, LARRY SCOTT, by and through his attorney, BASILEIOS J. FOUTRIS, and, pursuant to Local Rule 56.1, hereby submits the following additional facts in support of his response to the Defendants' partial motion for summary judgment:

1.    Larry Scott started using heroin when he was 14 years old – which he used as an escape mechanism when things were going bad and he could not cope. (Scott dep., attached hereto as Exhibit 8, p. 17, 69-70). He last used heroin at approximately 6 am on October 2, 2000. (Ex. 8, Scott dep., p. 133).

2.    On that date he was arrested by the Chicago Ridge police department for retail theft, but was eventually released on a recognizance bond. (Scott testimony of 11-19-02, attached hereto as Exhibit 2, p. 7-8; Ex. 8, Scott dep. p. 123-124). As he was walking into the lobby of the Chicago Ridge police station, he was met by Defendants Fassl and Almazan – who, after confirming his identity, told Scott to place his hands behind his back, handcuffed Scott, and transported him to the Chicago police department's Area 2 for questioning. (Ex. 2, Scott 11-19-02, p. 9-10, 12; Scott testimony

1

of 6-19-03, attached hereto as Exhibit 4, p. 5-6; Ex. 8, Scott dep., p. 125-126, 128-129, 133; Fassl testimony of 2-4-03, attached hereto as Exhibit 3 p. 13; Fassl dep., attached hereto as Exhibit 9, p. 111; Almazan dep., attached hereto as Exhibit 10, p. 68-69). Both Fassl and Almazan knew that Scott had already bonded out of the Chicago Ridge police station when they confronted him. (Ex. 9, Fassl dep., p. 114; Ex. 10, Almazan dep., p. 102-103).

   3. Scott was picked up by Fassl and Almazan because Defendant Brownfield had issued a "stop order" – which expressly stated that there was no probable cause to arrest Scott – indicating that Area 2 detectives wanted to speak to Scott concerning the murder of Jesus Villalobos. (Ex. 9, Fassl dep., p. 99-101; Brownfield dep., attached hereto as Exhibit 11, p. 107- 108). The stop order was issued by Defendant Brownfield – an officer that worked for Jon Burge at Area 2 when he was initially promoted to detective – based on a confidential informant named Jeff Blankenship stating that Scott committed the murder. (Ex. 11, Brownfield dep., p. 10, 108). Area 2 detectives knew that Blankenship was the confidential informant, and detectives actually spoke to him before Scott's arrest. (Ex. 9, Fassl dep., p. 222; Dougherty dep., attached hereto as Ex. 13, p. 19; Thomas dep., attached hereto as Exhibit 15, p. 52, 55). In addition, before Scott made his statements, Fassl, Almazan and Brownfield actually spoke to Officers Nicol and Thomas – the officers that spoke to Blankenship – about the information provided. (Ex. 9, Fassl dep., p. 222; Ex. 10, Almazan dep., p. 151-152, 236-237).

   4. Blankenship – who refused to explain how he knew Scott was involved in the murder – was a heroin addict that sold drugs, was a known burglar, was a known criminal in the Chicago police department's District 5 (which is housed in the same

2

building as Area 2), and was paid by Chicago police officers for his tips – some of which were good and some of which were bad. (Ex. 8, Scott dep., p. 270; Ex. 9, Fassl dep., p. 82; Ex. 10, Almazan dep., p. 86; Ex. 13, Dougherty dep., p. 16-17; Ex. 15, Thomas dep., p. 40-41; Nicol dep., attached hereto as Exhibit 16, p. 54; Ciesiun dep., attached hereto as Exhibit 17, p. 71-72, 105). Fassl knew of Blankenship and knew that he was involved in criminal activity. (Ex. 9, Fassl dep., p. 83-84; Ex. 13, Dougherty dep., p. 20).

     5.    When Scott, Fassl and Almazan arrived at Area 2, Scott was placed in interview room 7 and the door was locked. (Ex. 8, Scott dep., p. 135; Ex. 3, Fassl 2-4-03, p. 14; Ex. 9, Fassl dep., p. 126; Ex. 10, Almazan dep., p. 72-73). Interview room 7 was a 10' x 12' room with cinder block walls, a table but no clock, office lighting that can only be turned on or off from outside the room, it had a 2'x 6' metal bench, a metal ring for handcuffs to be secured, a steel door that locked from the outside, and a small window on the steel door that was covered with paper from the outside. (Scott testimony of 1-16-04, attached hereto as Exhibit 7, p. 32; Ex. 8, Scott dep., p. 136-137; Ex. 3, Fassl 2-4-03, p. 41; Ex. 9, Fassl dep., p. 77; Ex. 10, Almazan dep., p. 75). The entire time that Scott was at Area 2, with the exception of when the videotaped statements were given, Scott was kept locked in that room, and the lights were always kept on. (Ex. 8, Scott dep., p. 170, 206; Ex. 9, Fassl dep., p. 76-77; Ex. 10, Almazan dep., p. 75-76, 159).

     6.    At the time of his arrest, Scott suffered from an abscess (an infection) in his foot that was bleeding and oozing puss, and he also suffered from endocarditis – an inflammation of the lining of the heart that can become fatal if an infection in other parts of the body are left untreated and spread to the heart. (Ex. 4, Scott 6-19-03, p. 10; Ex. 8 Scott dep. p. 90, 133, 144-145; Ex. 4, testimony of Hargan 6-19-03 p. 66; Hargan dep.,

3

attached hereto as Exhibit 14, p. 60; Zalzaleh dep., attached hereto as Exhibit 18, p. 11, 23-24, 29).

7. At approximately 11:15 pm on October 2, 2000, Fassl and Almazan interviewed Scott in interview room 7. (Ex. 8, Scott dep., p. 137; Ex. 3, Fassl 2-4-03, p. 15; Ex. 9, Fassl dep., p. 143; Ex. 10, Almazan dep., p. 86). During this interview, Scott indicated that he knew Villalobos as "Jefe" but denied any involvement in the murder. (Ex. 8, Scott dep., p. 137-138; Ex. 3, Fassl 2-4-03, p. 18). In response, Almazan threw a picture in front of Scott – which depicted Villalobos' dead body with an open shirt showing wounds on his upper torso – and angrily said "bulls—t, this is your f—ing work". (Ex. 4, Scott 6-19-03, p. 7; Ex. 8, Scott dep., p. 139-140). During the interview Almazan was accusing Scott of participation in the murder. (Ex. 8, Scott dep., p. 160-161).

8. Scott stated he had nothing to do with the murder and immediately asked for a lawyer, but his request was ignored. (Ex. 8, Scott dep., p. 140, 198-199). Scott also immediately informed Fassl and Almazan that he was a heroin addict, that he had been using heroin for 20 years, that he still used heroin as of October 2000, that he was beginning to go through heroin withdrawal, and that he needed medical attention. (Ex. 4, Scott 6-19-03, p. 6-8; Ex. 7, Scott 1-16-04, p. 37; Ex. 8, Scott dep., p. 143-144, 198; Ex. 3, Fassl 2-4-03, p. 18; Fassl testimony of 6-20-03, attached hereto as Exhibit 5, p. 48-49; Fassl testimony of 1-15-04, attached hereto as Exhibit 6, p. 48; Ex. 9, Fassl dep., p. 162-163; Ex. 10, Almazan dep., p. 91). He was ignored and told that he would get treatment at the county. (Ex. 4, Scott 6-19-03, p. 6-8; Ex. 7, Scott 1-16-04, p. 37; Ex. 8, Scott dep., p. 198). At the end of the interview, Fassl and Almazan made it clear to Scott that there

4

would be additional investigation, they left the room, locked the door, and eventually went home. (Ex. 3, Fassl 2-4-03, p. 20; Ex. 6, Fassl 1-15-04, p. 49; Ex. 9, Fassl dep., p. 158-159; Ex. 10, Almazan dep., p. 113, 115).

9. As of October 2, 2000, Fassl had seen people going through heroin withdrawal, including one of his relatives. (Ex. 9, Fassl dep., p. 22, 165). Fassl knew that people going through withdrawal had sweating, they had itches that they needed to scratch, they had changes to their complexion and/or physical appearance, they had physical sickness which included vomiting or diarrhea, and he knew that methadone and sugar intake helped them. (Ex. 9, Fassl dep., p. 23-25). Fassl also knew that the number one priority for people going through withdrawal was alleviating the symptoms of the withdrawal. (Ex. 9, Fassl dep., p. 166).

10. As of October 2, 2000, Almazan had training regarding drug addiction, and had seen people go through heroin withdrawal several times while on the job, and had also seen a friend go through heroin withdrawal. (Ex. 10, Almazan dep., p. 46-47, 51). Almazan knew that people going through withdrawal had cramps, a lot of pain, and "overall sickness" that includes vomiting. (Ex. 10, Almazan dep., p. 49-50). He also knew that methadone helped people that were going through withdrawal. (Ex. 10, Almazan dep., p. 50).

11. Overnight, Scott's withdrawal became worse and he needed to use the bathroom. He banged on the door so that he could go to the bathroom but nobody responded. When nobody responded, Scott eventually vomited and urinated in the room. Afterwards, Scott was escorted to a bathroom by a uniformed officer – no other officer

5

took him to a bathroom. (Ex. 4, Scott 6-19-03, p. 8-9; Ex. 7, Scott 1-16-04, p. 39; Ex. 8, Scott dep., p. 154).

    12.    Fassl and Almazan came back to work at Area 2 around 10:00 am on October 3, 2000. (Ex. 9, Fassl dep., p. 161-162). Soon afterwards, and before speaking to Scott again, Fassl and Almazan met with Brownfield and, during a 20 minute conversation, told Brownfield everything Scott said the previous night, including that Scott was a heroin addict. (Ex. 9, Fassl dep., p. 167-168; Ex. 10, Almazan dep., p. 126-128; Ex. 11, Brownfield dep., p. 23-24, 114-116). They did so because the murder case was Brownfield's case. (Ex. 9, Fassl dep., p. 167; Ex. 11, Brownfield dep., p.35-36).

    13.    At approximately 11:30 am on October 3, 2000, Fassl and Almazan interviewed Scott for the second time. (Ex. 3, Fassl 2-4-03, p. 20-21; Ex. 6, Fassl 1-15-04, p. 16-17; Ex. 9, Fassl dep., p. 171, 173; Ex. 10, Almazan dep., p. 128-129). When Fassl first entered the interview room for that interview, Scott was laying on the floor in a fetal position, his legs were involuntarily kicking because of muscle spasms, he was shaking because he was freezing cold, he was sweating, he was suffering from diarrhea and, unable to contain himself, he had accidentally defecated on himself. (Ex. 8, Scott dep., p. 164-165). The acute symptoms of withdrawal, include, among other things, vomiting, pain, an increased or heightened sensitivity to pain, and diarrhea. (Ex. 4, Hargan 6-19-03 testimony, p. 62-63; Ex. 14, Hargan dep., p. 67). At that point in time, Scott had not yet been allowed to use the bathroom while he was at Area 2. (Ex. 8, Scott dep., p. 165).

14. As Fassl entered the room for the 11:30 am interview with Scott, Scott asked Fassl if he could go to the bathroom and also asked Fassl for medical attention. In response, Fassl said "I'll be right back" and left. (Ex. 8, Scott dep., p. 165-166).

15. When Fassl returned, Scott immediately asked for medical attention and an attorney. (Ex. 8, Scott dep., p. 166-168, 174-175, 182, 198). Scott explained his medical history, explained that he had an infection in his foot, explained that he suffered from endocarditis, and he also explained the danger that the infection posed to him due to the endocarditis. (Ex. 8, Scott dep., p. 166-168, 174-175, 182, 198). Scott also took his boot off and showed Fassl his foot – which was covered in blood and puss and smelled similar to rotting flesh. (Ex. 8, Scott dep., p. 166-168, 174-175, 182, 198). For someone going through heroin withdrawal, any pain associated with an infection, such as an abscess, would be increased. (Ex. 14, Hargan dep., p. 99). Due to the endocarditis, the infection was dangerous and could be fatal for Scott. (Ex. 4, Hargan 6-19-03 testimony, p. 66; Ex. 14, Hargan dep., p. 60).

16. Fassl told him that it looked "nasty" and that "it stinks", and then stated, "You're going to have to wait. Do you want a cigarette?" (Ex. 8, Scott dep., p. 166-168, 174-175). Almazan then gave Scott a cigarette. (Ex. 8, Scott dep., p. 166-168, 174-175). Fassl then told Scott, "Come on. Sit up. I need to ask you some more questions." (Ex. 8, Scott dep., p. 166-168, 174-175). Fassl and Almazan then re-interviewed Scott. (Ex. 9, Fassl dep., p. 171, 173; Ex. 10, Almazan dep., p. 128-129). After the interview concluded, Fassl spoke with Brownfield and discussed with "…Brownfield what [he] had learned during this second interview with Larry Scott". (Ex. 9, Fassl dep., p. 186).

7

17. On October 3, 2000 Brownfield interviewed Scott twice regarding the Villalobos murder. (Ex. 8, Scott dep., p. 145-147). During both interviews with Brownfield, Scott asked for an attorney and for medical attention – his requests were ignored. (Ex. 8, Scott dep., p. 143-144, 147, 198-199).

18. During the first interview with Brownfield, Scott told Brownfield that he was sick and that he was going through withdrawal. (Ex. 4, Scott 6-19-03, p. 11; Ex. 7, Scott 1-16-04, p. 44; Ex. 8, Scott dep., p. 147-148). Brownfield responded that Scott would be taken care of, that if he answered more questions he could get out of there, and if Scott took a polygraph exam he would be exonerated. (Ex. 4, Scott 6-19-03, p. 11; Ex. 7, Scott 1-16-04, p. 44; Ex. 8, Scott dep., p. 147, 151). Scott agreed to take the polygraph, and he was taken for the exam by Brownfield and his partner. (Ex. 8, Scott dep., p. 150; Ex. 11, Brownfield dep., p. 132).

19. Scott told the polygraph examiner that he was a heroin addict, that the last time he used heroin was in the last 24 hours, that he suffered from a heart problem called endocarditis, that he was going through withdrawal, and that he had not slept since he was arrested. (Ex. 4, Scott 6-19-03, p. 13-14; Bartik dep., attached hereto as Exhibit 12, p. 67-68, 72-74). On his handwritten notes the examiner noted that Scott stated that he was a heroin addict, that he had not slept, and that he was "jonesin" – slang for craving heroin. (Ex. 12, Bartik dep., p. 67-68; Polygraph Examiner Worksheet, attached hereto as Exhibit 19).

20. After the polygraph exam Scott was taken back to Area 2. (Ex. 8, Scott dep., p. 149). On the way back Scott once again told Brownfield that he needed medical attention. (Ex. 8, Scott dep., p. 152). Instead of offering medical attention, Brownfield

8

asked Scott if he wanted something to eat. (Ex. 8, Scott dep., p. 152). Scott told him that he was too sick to eat, but that he would like some coffee with a lot of sugar in it since the sugar helped alleviate some of the withdrawal symptoms. (Ex. 4, Scott 6-19-03, p. 14-15; Ex. 7, Scott 1-16-04, p. 46-47; Ex. 8, Scott dep., p. 152). Brownfield stopped at McDonald's and bought Scott a hamburger – which he was too sick to eat – and coffee with extra sugar. (Ex. 8, Scott dep., p. 152, Ex. 11, Brownfield dep., p. 146). Scott was not given anything else until after he provided his statements. (Ex. 8, Scott dep., p. 173).

21. Brownfield knew that methadone helped with heroin withdrawal, and had heard that sugar also helped. (Ex. 11, Brownfield dep., p. 17-18).

22. On October 3, 2000, after Scott was brought back to Area 2 from the polygraph exam, Fassl interviewed Scott two more times – at 7:30 pm and at 11:30 pm. (Ex. 3, Fassl 2-4-03, p. 24-26; Ex. 9, Fassl dep., p. 198). The delay between the interviews was designed by Fassl to give Scott time "to think". (Ex. 9, Fassl dep., p. 208).

23. During these two interviews, Scott repeatedly asked for medical attention and again explained his medical issues – including references to the infection and how it could be lethal due to the endocarditis – and discussed with Fassl his "living experiences as a drug addict", the fact that he was a heroin addict, that Scott was still using heroin as of October of 2000, the amount or heroin that Scott used at the time, and that the last time he used heroin was sometime before the Chicago Ridge arrest. (Ex. 4, Scott 6-19-03, p. 16-17; Ex. 7, Scott 1-16-04, p. 48-49; Ex. 8, Scott dep., p. 198; Ex. 3, Fassl 2-4-03, p. 25; Ex. 9, Fassl dep., p. 200-202).

24. Fassl ignored the requests, indicated to Scott that he had a relative that overdosed on heroin, told Scott that Scott would get what he wanted if Fassl got what he wanted, stated that, "Well, you know what we need", told Scott that he used to take care of his people as a narcotics officer, and told Scott that he would help Scott if Scott helped Fassl. (Ex. 4, Scott 6-19-03, p. 16-18; Ex. 7, Scott 1-16-04, p. 49, 52; Ex. 8, Scott dep., p. 143-144).

25. Fassl told Almazan what was said after each of those two interviews. (Ex. 9, Fassl dep., p. 206, 213; Ex. 10, Almazan dep., p. 166, 172-173). In fact, throughout the investigation, Fassl, Almazan and Brownfield collaborated with each other and discussed with each other the developments of the investigation, including what Scott was saying. (Ex. 10, Almazan dep., p. 179).

26. On October 4, 2000, Fassl and Almazan decided, "as a last ditch effort", to take Scott to the murder scene to determine if Scott would give them any additional information or if he would confess. (Ex. 10, Almazan dep., p. 184-185). At that point, Fassl was "on his last straw" and did not know what else to do with Scott. (Ex. 11, Brownfield dep., p. 152-153). Fassl believed that taking Scott to the apartment would "maybe do something to Larry and make him confess". (Ex. 11, Brownfield dep., p. 152-153).

27. Throughout their interaction with Scott, Fassl and Almazan knew that this was a statement case – meaning that Scott needed to confess in order to be charged. (Ex. 3, Fassl 2-4-03, p. 46-47; Ex. 9, Fassl dep., p. 212; Ex. 10, Almazan dep., p. 58). In fact, one of Fassl's and Almazan's goals throughout Scott's period of confinement at Area 2 was to get Scott to confess to the murder, which is why they did not want Scott to leave

10

the police station, and why they never told him that he was free to go. (Fassl testimony of 6-25-01, attached hereto as Exhibit 1, p. 27-28; Ex., 3, Fassl 2-4-03, p. 47; Ex. 6, Fassl 1-15-04, p. 52; Ex. 9, Fassl dep., p. 181, 199, 205-206; Ex. 10, Almazan dep., p. 143, 161, 185). Consistent with that, the goal of taking Scott to Villalobos' apartment (the murder scene) was to get Scott to confess. (Ex. 3, Fassl 2-4-03, p. 48-49, 51; Ex. 10, Almazan dep., p. 185).

28. Before taking Scott to the murder scene Fassl went into room 7, where Scott was laying on the floor, and told Scott that he knew what Scott was going through. (Ex. 8, Scott dep., p. 174).

29. Fassl and Almazan took Scott to the scene in handcuffs, and he remained in handcuffs until he came back to Area 2 (including when he was in the apartment). (Ex. 4, Scott 6-19-03, p. 18; Ex. 7, Scott 1-16-04, p. 61-62; Ex. 8, Scott dep., p. 201-202; Ex. 3, Fassl 2-4-03, p. 28-29; Ex. 9, Fassl dep., p. 224; Ex. 10, Almazan dep., p. 190, 199, 208).

30. When they arrived at the scene (Villalobos' apartment) they were met by Detectives Haras and Dougherty – Fassl's friend and former partner. (Ex. 3, Fassl 2-4-03, p. 28; Ex. 9, Fassl dep., p. 89, 231; Ex. 13, Dougherty dep., p. 10-11, 13, 28-29, 30). On the way into the apartment Scott was walking slowly and shaking. (Ex, 9, Fassl dep., p. 229-230). They went into the apartment, which was still a crime scene with dried blood in the kitchen, whereupon either Haras or Dougherty began repeatedly yelling and cursing at Scott, accusing Scott of murdering Villalobos, and telling him, among other things, that he was going "to burn for this". (Ex. 4, Scott 6-19-03, p. 19; Ex. 8, Scott dep., p. 202-204; Ex. 10, Almazan dep., p. 203).

11

31. Fassl then called Scott into another room and began describing to Scott how the murder occurred. (Ex. 4, Scott 6-19-03, p. 19-20; Ex. 7, Scott 1-16-04, p. 58-59; Ex. 8, Scott dep., p. 204). Scott denied any knowledge of the murder, asked for medical help and once again explained that he could die from the infection. (Ex. 4, Scott 6-19-03, p. 19-20; Ex. 7, Scott 1-16-04 , p. 59-60; Ex. 8, Scott dep., p. 205-206).

32. Fassl told Scott that he would help Scott if Scott helped him and said, "if you give me what I want, I'll give you what you want." (Ex. 4, Scott 6-19-03, p. 19-20; Ex. 7, Scott 1-16-04, p. 59-60; Ex. 8, Scott dep., p. 206-208). At that point, Scott told Fassl that he would do whatever it took and that he would provide Fassl with a statement. (Ex. 4, Scott 6-19-03, p. 19-20; Ex. 8, Scott dep., p. 209). However, Scott did not actually confess in the apartment. (Ex. 8, Scott dep., p. 209). Scott finally agreed to give a statement approximately 45 to 46 hours after he was picked up at the Chicago Ridge police station. (Ex. 3, Fassl 2-4-03, p. 46; Ex. 9, Fassl dep., p. 269).

33. Scott was then taken back to Area 2 and placed in the same interview room. (Ex. 8, Scott dep., p. 214; Ex. 3, Fassl 2-4-03, p. 32). Fassl came into the room with a legal pad and fed Scott information regarding how the murder took place. (Ex/ 4, Scott 6-19-03, p. 21; Ex. 7, Scott 1-16-04, p. 65-66; Ex. 8, Scott dep., p. 214-215). When he finished feeding Scott the information, Fassl told Scott that he would have to provide a video statement. (Ex. 4, Scott 6-19-03, p. 22; Ex. 7, Scott 1-16-04, p. 65-66).

34. Soon afterwards, Fassl re-entered the room along with Assistant State's Attorney Papa. Fassl made it clear to Scott that Papa was working with Fassl. (Ex. 6, Fassl 1-15-04, p. 71). At that point, Scott believed that Fassl was in charge, he was intimidated by Fassl, and he believed that if he told Papa about what had happened that

his agreement with Fassl would be voided and he would not be provided medical attention. (Ex. 4, Scott 6-19-03, p. 22-23; Ex. 8, Scott dep., p. 143-144, 196-197, 234-235).

35. Scott eventually gave two videotaped statements. (Ex. 8, Scott dep., p. 186-187). When the first statement was done, without providing an explanation, Papa told Scott that he needed to do it again. (Ex. 8, Scott dep., p. 186-187).

36. Scott was never Mirandized by any police officer while he was at Area 2, or when he was taken to Villalobos' apartment – not by Fassl, Almazan or Brownfield. (Ex. 8, Scott dep., p. 143, 145-146; Ex. 10, Almazan dep., p. 218-219). Scott asked for an attorney every single time that he was questioned by a police officer. (Ex. 8, Scott dep., p. 198-199). Every single request was ignored, just as if the question was never even asked. (Ex. 8, Scott dep., p. 198-199)

37. Scott also told every officer he encountered at Area 2 that he needed medical attention, providing his entire medical history in the process. (Ex. 8, Scott dep. ,p. 143-144).

38. Scott eventually was taken to the Cook County Department of Corrections, where, on October 6, 2000 Dr. Ghassan Zalzaleh diagnosed Scott with heroin withdrawal and an infection in his foot. Dr. Zalzaleh prescribed Routine A to Scott – medication which includes methadone – to alleviate the symptoms of heroin withdrawal. Dr. Zalzaleh also provided Scott with antibiotics to treat the infection. (Ex. 4, Scott 6-19-03, p. 23-24; Ex. 8, Scott dep., p. 84; Ex. 7, Zalzaleh 1-16-04 testimony, p. 15-16; Ex. 18, Zalzaleh dep., p. 8, 25, 29, 31, 35, 36, 39).

39. During his interactions with the police at Area 2 (which included the drive from Chicago Ridge to Area 2, his time at Area 2, the drive to and from the polygraph examiner, the drive to the victim's apartment, the time immediately before the videotaped statements, and the time when the videotaped statements were taken), in addition to the above, Scott's withdrawal symptoms included: vomiting a total of 3 times (including bile), nausea, yawning, an inability to sit still, jittery, rocking back and forth, dry heaving (since there was nothing else left to vomit), watery eyes, periodic sneezing, goose pimples, severe muscle aches (including, seemingly, the roots of his hair), severe pain in his foot, tremors, shakiness, and insomnia. (Ex. 8, Scott dep., p. 130, 150-151,153, 164, 181-186, 201, 264).

40. To date, there has never been any evidence, other than Scott's confessions, that point to Scott as the murderer. (Sarley dep., attached hereto as Exhibit 20, p. 45, 50; Nazarian dep., attached hereto as Exhibit 21, p. 5, 6, 20-21, 28, 31; Defendants' Joint Response to Plaintiff's First Request to Admit, attached hereto as Exhibit 22).

        Respectfully submitted by,

        s/Basileios J. Foutris
        BASILEIOS J. FOUTRIS
        Attorney for Plaintiff
        FOUTRIS LAW OFFICE, LTD.
        53 West Jackson, Suite 252
        Chicago, Illinois 60604
        312-212-1200

**CERTIFICATE OF SERVICE**

The undersigned, attorney of record herein, hereby certifies that on February 12, 2010, the foregoing **PLAINTIFF'S ADDITIONAL FACTS IN REPSPONSE TO THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, along with judge's courtesy copies being delivered; which will send notification of such filing to: Arlene Esther Martin at amartin@cityofchicago.org, Matthew Raymond Hader at matt.hader@cityofchicago.org, Anne Katherine Preston at apreston@cityofchicago.org and George John Yamin, Jr. at gyamin@cityofchicago.org.

                                                                                      s/ Basileios J. Foutris
                                                                                      BASILEIOS J. FOUTRIS
                                                                                      Attorney for Plaintiff
                                                                                      FOUTRIS LAW OFFICE, LTD.
                                                                                      53 West Jackson, Suite 252
                                                                                      Chicago, Illinois 60604
                                                                                      312-212-1200