IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No.  07 C 3684 |
| | ) |
| CITY OF CHICAGO, et al., | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Larry Scott ("Scott") has brought this action against the City of Chicago ("City") and several individual members of the Chicago police force, asserting (along with state law claims) claims under 42 U.S.C. §1983 ("Section 1983") of a coerced confession (Count I) and conscience-shocking behavior (Count II). Now the remaining individual defendants[1]--Officers John Fassl ("Fassl"), Al Almazan ("Almazan") and Steve Brownfield ("Brownfield")(collectively "Officers")--have moved for partial summary judgment under Fed. R. Civ. P. ("Rule") 56, claiming qualified immunity.[2] Additionally, each side has moved to strike the other's additional facts in response to or in support of Officers' motion. For the reasons stated here, the Rule 56 motion is denied, as are both motions to strike.

---

[1] Officers Edward Nicol ("Nicol") and Larry Thomas ("Thomas") have previously been dismissed voluntarily by Scott.

[2] This opinion identifies Scott's and Officers' respective submissions as "S." and "O.," followed by appropriate designations: memoranda as "Mem.--" and responses as "Resp.--." Both sides' LR 56.1 statements are cited "St. ¶ --."

**Standard of Review**

Every Rule 56 movant bears the burden of establishing the absence of any genuine material (that is, outcome-determinative) factual dispute (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).[3] But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of disputed fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Background**

Scott, a heroin addict (S. St. ¶1, O. St. ¶21)), was arrested for retail theft on October 2, 2000 by police in Chicago Ridge, Illinois (S. St. ¶2, O. St. ¶11).[4] Upon running Scott's name through the computer system, Chicago Ridge police discovered

---

[3] Hence the "Background" section will recite the facts in the light most favorable to Scott.

[4] Further references to dates will omit the year, as all relevant events took place in 2000.

that the City of Chicago police had issued a "stop order" for Scott because of his suspected involvement in the murder of Jesus Villalobos ("Villalobos") (O. St. ¶¶7-10, 12). Brownfield had issued the stop order after confidential informant Jeff Blankenship had told Nicol and Thomas that Scott had murdered Villalobos (id.). That stop order said the Chicago police wanted to interview Scott regarding his possible involvement in the homicide and noted that the police did not have probable cause to arrest Scott (id., S. St. ¶3).

Chicago Ridge police released Scott on a recognizance bond (O. St. ¶13). When Scott emerged from the Chicago Ridge police station, Fassl and Almazan were waiting for him (id. ¶16). They told him they wanted to talk to him, handcuffed him and drove him to the Chicago police department's Area 2 (id.).

Once at Area 2, Scott was placed in interview room 7, where he remained through October 4, with the exception of a period of time on October 3 when he was taken by Brownfield for a polygraph test (id. ¶¶16-34, S. St. ¶¶5-29).[5] At all times Scott was either accompanied in interview room 7 by a Chicago police officer or he was locked in (see S. St. ¶5). In the end, Scott spent two nights in interview room 7 (id.).

Scott had last used heroin on the morning of October 2

---

[5] Scott consented to the polygraph as well as to a buccal swab.

before he was arrested by the Chicago Ridge police (id. ¶1). By the time he was taken to Area 2, Scott had begun going through heroin withdrawal (id. ¶8), and he continued to suffer the symptoms of withdrawal throughout the time he was at Area 2 (id.). Scott states that his withdrawal symptoms included nausea, vomiting, diarrhea, muscle spasms, shivering and pain (see id. ¶13). Scott also states that he repeatedly told Officers that he was going through heroin withdrawal and needed medical treatment (id. ¶¶8, 12, 14-24).[6]

Scott also had an infection on his foot, at an injection site (see S. St. ¶6). Because Scott also suffered from endocarditis, an inflammation of the heart, the infection on his foot could have been fatal (id.). Officers deny having any knowledge that Scott suffered from any severe medical condition while he was confined at Area 2 (see O. St. ¶26; O. Resp. St. ¶6).

Interview room 7 did not have a bed or bedding, nor was it equipped with a toilet (S. St. ¶5). It contained only a table and a bench, and the overhead lights remained on during the entire time Scott was held there (id.).

During the first night Scott was detained at Area 2, he

---

[6] Officers, however, assert that Scott displayed no physical symptoms of heroin withdrawal, nor did he request medical treatment at any time (O. St. ¶¶23-26). As n.3 indicates, Scott's version and not Officers' is credited on the current motion.

knocked on the door to get someone's attention so he might be escorted to a bathroom, but no one opened the door for him (id. ¶11). He was forced to urinate in the corner of the room (id.). Scott was also suffering from diarrhea and was unable to avoid defecating on himself during the night (id.). He also vomited in the corner of the room during the night (id.). Officers claim they had no knowledge that Scott was prevented from using the toilet facilities or that he was sick overnight (O. Resp. St. ¶11).

Scott was unable to eat because he was suffering from severe nausea as a result of going through heroin withdrawal (S. St. ¶20). He was, however, able to drink some heavily sugared coffee that Brownfield bought him when they returned from Scott's polygraph test (id.). Scott requested the extra sugar because he knew that sugar can alleviate the symptoms of heroin withdrawal (id.). Brownfield also bought him a hamburger at that time, but Scott could not eat it (id.). That was the last food or drink Scott was provided until he left Area 2 on October 4 (id.).

Almazan and Fassl questioned Scott at least four times at Area 2 about his involvement in Villalobos' murder (S. St. passim). During the two days of questioning, Scott denied having any involvement in Villalobos' murder (see S. St. ¶8). Scott did admit that he knew Villalobos because he used to sell Villalobos stolen goods (id. ¶7). Scott also sold Villalobos a gun once

5

(see O. St. ¶17). Scott would buy drugs with the money he received from selling stolen goods (id. ¶21).

Because no physical evidence connected Scott to the crime scene, Fassl believed the only way to close the murder investigation was to get Scott to confess (id. ¶27). To that end, on October 4, Fassl transported Scott to Villalobos' apartment, the murder scene (id. ¶¶27-29). Fassl believed doing so might cause Scott to confess to the murder (see id.).

While at the apartment, Scott told Fassl he would make a statement (id. ¶32). He agreed to do so after Fassl either told him or implied that he would help him by making sure he received medical treatment (id.). According to Fassl, Scott confessed in the apartment, but Scott says that he did not confess until Fassl took him back to Area 2, where Scott met with Assistant State's Attorney Jim Papa ("Papa") and made a videotaped confession (O. St. ¶34, S. St. ¶¶32-35). When Scott met with Papa, he did not tell him that his confession was false because he believed Fassl would then make sure he did not receive medical treatment (S. St. ¶34). Papa read Scott his Miranda rights and then took a videotaped confession from Scott (id. ¶35). Scott recalls that Papa then asked him to repeat the videotaped confession but that he did not explain why it was necessary (id.).

After giving his statement, Scott was taken to the Cook County Department of Corrections where he was seen by a physician

(id. ¶38). He was prescribed medication to alleviate the symptoms of heroin withdrawal and was given antibiotics for the infection on his foot (id.)

Scott was later tried and convicted of Villalobos' murder. On June 30, 2006 the Illinois Appellate Court found Scott's confession was not sufficiently attenuated from his illegal arrest and reversed his conviction, remanding to the trial court (O. St. ¶39). Cook County State's Attorney's office then entered a nolle prosequi (id. ¶40). Scott filed this action on June 29, 2007, alleging that the individual defendants had obtained his confession by means of coercion and that their tactics were a conscience-shocking violation of due process.[7]

This Court has already held that Scott's Fifth[8] and Fourteenth Amendment claims are timely under Heck v. Humphrey, 512 U.S. 477 (1994) and that Wallace v. Kato, 594 U.S. 384 (2007) does not bar him from bringing this suit. Officers' repeated argument to the contrary is therefore disregarded.[9]

---

[7] Scott also claims a state law violation of malicious prosecution. That issue is not before this Court on the current motion.

[8] As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which literally impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody most Bill of Rights guaranties).

[9] In their motion, Officers repeatedly argue that Scott's claims sound in false arrest, unconstitutional conditions of

**Qualified Immunity**

Qualified immunity is designed to shield government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), followed in innumerable cases such as Chaklos v. Stevens, 560 F.3d 705, 710 (7th Cir. 2009)). Pearson v. Callahan, 129 S.Ct. 808, 818 (2009) has overbidden the previously mandatory two-step evaluation decreed by Saucier v. Katz, 533 U.S. 194, 200-01 (2001) and now leaves it to lower courts to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

Granting qualified immunity is inappropriate when its resolution turns on disputed issues of fact. As stated in Markham v. White, 172 F.3d 486, 493 (7th Cir. 1999), citing cases:

> If an immunity determination depends on factual determinations, we do not even have jurisdiction to entertain it.

Accord, McKinney v. Duplain, 463 F.3d 679, 688 (7th Cir. 2006)).

Many of the facts presented by Officers and Scott are

---

confinement, delay of medical treatment and denial of right to counsel. This Court has already addressed those misperceptions, as noted in its January 4, 2010 memorandum opinion and order. No fair reading of Scott's complaint leads to the conclusion that he has brought any of those claims.

disputed. And as stated earlier, each side has moved to strike the additional facts submitted by the other:

    1. Officers have moved to strike the entirety of Scott's LR 56.1 statement for a variety of reasons, including that Scott has exceeded the numerical limits set forth in LR 56.1 and that he has repeated facts contained in Officers' LR 56.1 statement.

    2. Scott has moved to strike Officers' additional facts in support because none of those facts are undisputed.

Each party's contentions have some arguable merit. But neither motion to strike is granted for the simple reason that none of the additional facts matter. Scott's response to Officer's LR 56.1 statement makes it clear that most, if not all, of the facts critical to Officers' motion are disputed.

That being the case, this opinion will exercise the Pearson-authorized discretion to address the second prong of the qualified immunity inquiry first.[10] If Officers' alleged behavior did not violate clearly established constitutional rights, their motion does not turn on issues of fact. But if

---

[10] To that end, this Court asked Officers to submit in lieu of a reply brief a list of cases speaking only to the second prong of the qualified immunity analysis. Unfortunately, most of those cases speak instead to the officers' argument that Scott's claims fall under the Fourth Amendment and are thus untimely. As already noted, this opinion will not entertain that line of argument, this Court having already made it quite clear that Scott has not advanced any Fourth-Amendment-based claims and that the claims he has made are timely.

Scott's claimed constitutional rights were clearly recognized in 2000, the factual disputes are fatal to Officers' motion.

**Fifth Amendment Right**

Despite the individual defendants' assertions to the contrary, the Fifth Amendment right against self-incrimination was clearly established long before 2000, when Scott made his incriminating statement (see Malloy v. Hogan, 378 U.S. 1, 6 (1964)). That right against self-incrimination applies when compelled statements are used against a defendant (cf. Brown v. Mississippi, 297 U.S. 278, 286 (1936)). Chavez v. Martinez, 538 U.S. 760, 767 (2003) clarified that the existence of the right depends on the use of a self-incriminating statement against a defendant in a criminal case--the mere act of coercing such a statement is not a Fifth Amendment violation.

In asserting immunity from Scott's Fifth Amendment claims, Officers first mistakenly argue that Scott is invoking the Fifth Amendment's due process right (which is not incorporated against the states, for the Fourteenth Amendment has its own Due Process Clause) rather than the Fifth Amendment's right against self-incrimination. Not so--Malloy, 378 U.S. at 6 expressly teaches that Scott's due process claim is properly advanced under the Fourteenth Amendment. That argument by Officers, then, is easily disposed of: It is rejected out of hand.

Second and more to the point, Officers challenge Scott's

Fifth Amendment claim on the ground that Scott's statement to Fassl in the apartment was not used against him at trial, as required by Chavez.[11] Instead, they contend, only Scott's videotaped confession was used against him at trial, and he waived his Miranda rights before confessing on tape.

But it is simply not true that the videotaped confession was the only statement used against him at trial. Fassl testified at length about the events of October 4, including his having taken Scott to the murder scene in the hope that Scott would confess to the crime, and he specifically described the statement he claims Scott made to him in the apartment. In other words, if Scott made that incriminating statement and if it was compelled (both disputed issues of fact that this opinion does not address), Fassl's testimony on that score at Scott's criminal trial had clearly been recognized as a constitutional violation before 2000.

**Fourteenth Amendment Right**

Conscience-shocking behavior by the police was likewise clearly recognizable as a violation of the Fourteenth Amendment's

---

[11] It will be recalled that Scott says he did not confess in the apartment. But Fassl claims Scott did confess in the apartment and, indeed, testified to that at Scott's criminal trial. Because it is thus Officers' position that Scott confessed to Fassl in the apartment, their argument that "[t]here was no statement that Plaintiff gave to Fassl that implicating [sic] himself in the murder that was used against him at trial" (O. Mem. 8) is inconsistent with the "facts" as they present them.

substantive due process guaranty by the year 2000. Such a violation takes place when the police use tactics that "offend[ ] those requirements of decency and fairness which, because they are 'implicit in the concept of ordered liberty,' are imposed by the Due Process Clause upon the states" (Duncan v. Nelson, 466 F.2d 939, 944 (7th Cir. 1972), quoting Monroe v. Pape, 365 U.S. 167, 208 (1961)). More recent precedent also makes clear that the application of a due process analysis to coercive questioning has not been abandoned in the wake of an emerging Fifth Amendment jurisprudence (Dickerson v. United States, 530 U.S. 428, 433 (2000)).

Yet Officers suggest that the Fourteenth Amendment right that Scott is claiming was not recognized until Chavez allowed for its "possibility." And they assert alternatively that Scott's Fourteenth Amendment claim is merely duplicative of his Fifth Amendment and state malicious prosecution claims.[12]

Officers first argue that Chavez changed the legal landscape in 2003 by allowing for the "possibility" of a Fourteenth Amendment claim arising from physical or mental coercion, suggesting that coexistent Fifth and Fourteenth Amendment claims were unknown before 2003. That is wrong. Dickerson, 530 U.S. at

---

[12] Again Officers' counsel try to fit Scott's claims under the rubrics of false arrest, unconstitutional conditions of confinement and denial of medical care, as well as contesting the actual facts of Scott's interrogation. This opinion has already rejected those arguments.

433--handed down before Scott's arrest--had expressly reconfirmed that the Fourteenth Amendment provides a constitutional basis for challenging an involuntary confession:

> Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.

Chavez, 538 U.S. at 779 simply clarified that a claimant's substantive due process claim based on "outrageous conduct by the police" in the course of extracting a confession remains viable even when he has no Fifth Amendment claim because that confession is not used at trial.

Officers next urge that Scott's Fourteenth Amendment claims do no more than recast his Fifth Amendment claims. They support that argument by citing only to an unpublished district court opinion, Lanza v. Chicago, No. 08 C 5103, 2009 WL 1543680, at *4-*5 (N.D. Ill. June 2)[13] that in turn cites Albright v. Oliver, 510 U.S. 266, 273 (1994)(internal quotation marks omitted) for the proposition that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the

---

[13] As our Court of Appeals regularly (and properly) reminds us, judges who labor in the vineyards at the District Court level do not create precedent. What is said in this opinion reflects this Court's views--also nonprecedential--after its consideration of applicable caselaw, with pronouncements only by our Court of Appeals and by the Supreme Court being fully binding here.

13

more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Officers argue that Scott's Fourteenth Amendment claims do nothing more than challenge his coerced self-incrimination.

But that ignores the substance of Scott's due process claims--that the very tactics used by Officers to extract a confession from him were a violation of his substantive due process rights. <u>Albright</u> refused to expand substantive due process to encompass a claim of arrest without probable cause because the Fourth Amendment already provides an adequate remedy for such claims. Scott's claims are not analogous. His claim under the Fifth Amendment--that he was compelled to make a self-incriminating statement that was used against him at trial--is not identical to his claim regarding the deprivation of his liberty caused by Officers' allegedly conscience-shocking conduct.

Officer's arguments regarding Scott's Fourteenth Amendment claims also fail, then. Scott has challenged alleged behavior on Officers' part that was clearly recognized as a constitutional violation before 2000. And that challenge does not simply recast his Fifth Amendment claim--it is instead an independent constitutional claim.

**Factual Determinations**

Because the rights Scott asserts were clearly established at

the time of his arrest, Officers' motion can succeed only if there is no disputed issue of fact as to whether those rights were actually violated. But this opinion has already reflected that the parties' LR 56.1 statements show that nearly all of the key facts are disputed. Scott and Officers dispute (1) whether they denied him food, water and ready access to a toilet in order to coerce him to confess, (2) the severity of his physical condition throughout his detention at Area 2 and (3) whether he was offered medical treatment in exchange for confessing to murder. Once again, with the facts taken in the light most favorable to Scott, Officers have failed to show that there is not a disputed issue of fact as to whether Scott's rights were violated.

That also torpedoes Almazan's and Brownfield's individual assertions that they did not participate in any coercive questioning and therefore cannot be liable under Section 1983. In that respect, although Section 1983 liability attaches only to those who personally act in constitutionally violative ways, "direct participation is not necessary" (Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003))--liability also attaches to a defendant if the conduct "occurred with his knowledge or consent" (Sanville v. McCaughtry, 266 F.3d 724, 741 (7th Cir. 2001), quoting Chavez, 251 F.3d at 652). Here too there are numerous disputed issues of fact as to how involved Almazan and Brownfield

15

were in deciding what tactics would be used in questioning Scott and as to the participation by each in using those tactics.

## Conclusion

Because the constitutional rights Scott asserts were clearly recognized before the year 2000, and because numerous disputed issues of fact preclude this Court from finding that Officers did not violate those rights, their motion for partial summary judgment is denied. And because the ill-considered motion had sidetracked the earlier-scheduled filing of a final pretrial order ("FPTO"), a status hearing is set for 9 a.m. April 15, 2010 to discuss an expedited schedule for a FPTO so that the case can be set for an early trial.[14]

_____
Milton I. Shadur
Senior United States District Judge

Date: April 8, 2010

---

[14] This opinion, coupled with this Court's earlier rulings rejecting defense counsel's repeated attempts to dispatch this case on legal rather than factual grounds, confirm that the current motion is only the most recent of counsel's protracted efforts to defer the day of reckoning in this action, which is now approaching its third anniversary ("day of reckoning" should not be misunderstood as an indication either way as to whether Scott will or will not ultimately be found to prevail on his claims, a subject as to which this Court expresses no views--it rather refers to Scott's entitlement, and defendants' as well, to have those claims resolved on the merits). Because the issues posed by the current motion are so fact-intensive, it may be in order to express a caveat that this Court would be inclined to view any effort to seek appellate review of this ruling, rather than cooperating in the procedure leading to trial, as a possible candidate for the invocation of 28 U.S.C. §1927.

16