IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LARRY SCOTT,                    )
                               )
            Plaintiff,          )
                               )
      v.                        )    No.  07 C 3684
                               )
CITY OF CHICAGO, et al.,        )
                               )
            Defendants.         )

MEMORANDUM OPINION AND ORDER

Following the May 28, 2010 approval and issuance of the
jointly submitted final pretrial order ("FPTO") in this action,
each side has deluged this Court with a host of motions in
limine.  With defense counsel now having tendered their
inadvertently omitted responses to Motions 5 and 6 advanced by
plaintiff Larry Scott ("Scott"), Scott's entire set of 15 motions
(plus a few subparts) is ready for consideration.  This
memorandum opinion and order addresses them, with an opinion that
will deal with defendants' motions in limine to follow later.

It should be remarked at the outset--and with regret--that
too much of defense counsel's work product, both in their
positions that triggered some of Scott's motions and in their
responses to those motions, seeks to defeat this action by
stressing that Scott is a bad man as evidenced by his extensive
criminal record.  This Court holds no brief for the criminal
element in our society--much of its time and effort as a federal
judge are devoted to the conviction and sentencing of defendants

charged with federal crimes--but this Court also recognizes that criminals too have constitutional rights, as defense counsel seem to question.

We have all witnessed a deterioration in society's regard for law enforcement personnel because of some bad apples who proceed from the premise that suspected or actual criminals have no rights and thus, by their own lawless actions, poison the environment for the large majority of law-abiding law enforcement officers. Although the most notorious example of that phenomenon here in the Chicago area has been provided by the recent conviction of former Police Commander Jon Burge, this case itself shows how shortsighted that premise can be: Scott's conviction on charges of first-degree murder and armed robbery was overturned because the Illinois Appellate Court held that the unlawful conduct of Detective John Fassl ("Fassl," one of the defendants in this action) had violated Scott's Fourth Amendment rights, tainting his confession and requiring its suppression (People v. Scott, 366 Ill.App. 638, 852 N.E.2d 531 (1st Dist. 2006)).

As a society we are entitled to expect more from those who are entrusted with the powers that we accord to law enforcement personnel. And a fortiori we are entitled to expect more from the lawyers in the public law offices. It is no accident that Illinois criminal prosecutions are brought in the name of the

"People of the State of Illinois," reflecting the concept that prosecutors are not merely advocates but are rather expected to serve as instruments of justice (in that respect, see Illinois Supreme Court Rule of Professional Conduct 3.8(a)), which expands Comment [1] to the ABA's Model Rule of Professional Conduct 3.8 by adding to that Comment's description of the duties of a prosecutor the following underlined language):

> The duty of a public prosecutor <u>or other government lawyer</u> is to seek justice, not merely to convict.

Although that language may be viewed as oriented toward the criminal practice, it hardly seems amiss to impose a like standard on the lawyers who represent government agencies or employees in civil matters.[1]

That said, this opinion turns to plaintiff's motions themselves. Mention should first be made of those that are not in dispute (all part of Dkt. 141):

1. Motion 7 has been withdrawn by Scott and is therefore moot.

2. Motions 10, 15(c), 15(f) and 15(h) have been agreed to by defendants and are therefore granted.

Now on to the contested motions.

---

[1] Both this action and the appeal in Scott's criminal case referred to earlier in the text involve representation by the same office--that of the Cook County State's Attorney. Does (or should) either group, respectively engaged in the civil and criminal practice, have greater public responsibilities than the other?

3

## Motion 1 (Dkt. 135)

Scott's Motion 1 seeks to bar from admission at trial (1) his videotaped confession, (2) the transcript of that confession and (3) what is called "the graphic demonstrative exhibit showing a transcription within the videotaped confession." In essence Scott's counsel argues that such a bar is supported by our Court of Appeals' very recent decision in Fox v. Hayes, 600 F.3d 819 (7th Cir. 2010), which upheld the decision by this Court's colleague Honorable Jack Darrah to bar a videotaped confession in a case having great similarity to this one.

Here is what Fox, id. at 840 said on the subject:

> But there are no allegations of physical harm that the video could verify, and all of the allegations of coercion stem from events leading up to the video-- events that the defendants chose not to record. Most importantly, the video represents just 23 of the 870 minutes or so of Kevin's[2] interrogation, and thus cannot provide a complete picture of either the interrogation itself or Kevin's level of distress. Under those circumstances, we cannot say that the court abused its discretion in concluding that the video's prejudicial effect and potential for confusing the jury outweighed its probative value with respect to the issue of coercion or Kevin's demeanor following the interrogation.

And here is Scott's argument as to why Fox should control here (Motion at 4, emphasis in original):

---

[2] [Footnote by this Court] "Kevin" is Kevin Fox, like Scott a 42 U.S.C. §1983 plaintiff asserting that law enforcement officers had violated his constitutional rights.

4

The striking resemblance between what the <u>Fox</u> plaintiff experienced and what the Plaintiff in this matter alleges is uncanny.  They both claim to have been subjected to emotional/psychological coercion, they both deny physical abuse, they both allege that their requests for an attorney were ignored, they both volunteered to take a polygraph examination to clear themselves, they both claim that their repeated denials of involvement in the murder fell on deaf ears, they both were offered a quid pro quo in exchange for confessing, and they both agreed to confess to have the police officers stop what they were doing.  **Critically, and most importantly, they both allege that the coercive interrogation tactics all occurred off camera**.

Because defense counsel really cannot dispute the just identified parallels between the two cases, and because it is obvious that the content of the confession is really not relevant (and even it if were, it poses a major danger of unfair prejudice so as to bring Fed. R. Evid. ("Evid. R.") 403 into play), a good deal of defendants' response to the motion is unpersuasive.  But on the other hand, there is force to the defense contention that the video's depiction of Scott's physical appearance at the time of the confession could be found probative by the jury.

Accordingly the video (but <u>not</u> the audio or the transcript, or the third item to which Scott objects, which sounds like the equivalent of closed captioning on a TV program) will be a permitted exhibit.  For that purpose the bowdlerized tape will have to be submitted to this Court for review and approval materially in advance of trial, so that any other necessary changes may be decided upon.

That degree of access on the part of the jury effectively

5

satisfies the legitimate aspects of defendants' response, while at the same time taking heed of the Rule 403 dangers that would be implicit in full access. Motion 1 is thus denied in principal part but is granted to a limited extent.

## Motion 2 (Dkt. 136)

Scott's Motion 2 seeks to preclude any trial testimony by Dr. Joel Silberberg, a psychiatrist who is one of defendants' proposed opinion witnesses as to Scott's asserted lack of damages. As Motion at 1 urges, Dr. Silberberg's testimony should be barred:

> because he is improperly boosting his own opinions (and credibility) by relying upon and basing his opinions on an undisclosed and non-testifying psychologist's opinions; and because it is impossible to determine whether the bases of Dr. Silberberg's opinions satisfy Daubert requirements.

What is at issue are the parties' competing opinions as to the extent of Scott's current state of depression and the cause of that condition, with defendants proffering Dr. Silberberg as a witness who is supported (he says) by a report authored by psychologist Dr. Robert Hanlon, while Scott relies on the opinions reached by Scott's retained damages witness, psychologist Dr. Paul Pasulka. Dr. Pasulka administered and has interpreted the results of a group of the recognized diagnostic tests to support such opinions, while Dr. Silberberg's deposition testimony admits (1) that he is not qualified to opine on that subject (due to a lack of training to administer or to interpret

such tests) and (2) that he chose instead to rely on Dr. Hanlon's review of Dr. Pasulka's testing because "there's a code of practice or code of ethics that only psychologists can comment on another psychologist's report."

This Court has an intimate familiarity with the provisions of Evid. R. 703 as to the bases that are permitted to support witnesses' opinion testimony--in its capacity as a member of the Judicial Conference's Advisory Committee on the Rules of Evidence before it was appointed to chair that Committee, this Court headed the subcommittee specially assigned to review and to recommend to the entire Committee revised versions of (1) Evid. R.s 701, 702 and 703 and (2) the Committee Notes to accompany the new versions of those Rules. In that respect it shared the principal draftsmanship of the new revised versions with the Committee's extraordinarily talented and knowledgeable reporter, Professor Daniel Capra of Fordham Law School. And having considered the current motion in depth, this Court finds that defendants' approach to the issue now at hand, which looks to Dr. Silberg's testimony while excluding that of Dr. Hanlon, fails the required Daubert-Kumho analysis.

There is of course no quarrel with Dr. Silberg's qualifications in his field. But in this instance that is a vice rather than a virtue, because it would impermissibly coat Dr. Silberg's opinion with the patina of expertise, even though he

acknowledges that he has chosen to credit Dr. Hanlon's opinions over those of Dr. Pasulka without possessing the professional know-how to do so.

Once again Scott's counsel calls upon a Seventh Circuit decision in support of his argument--one that points up the distinction between (1) an opinion witness' permissible use of another's opinion en route to reaching the witness' own opinion and (2) the flawed methodology employed by Dr. Silberberg (Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609 (7th Cir. 2002)).  Because of the comprehensive nature of the analysis there, it bears quotation at length (id. at 613-14, with most citations omitted):

> Now it is common in technical fields for an expert to
> base an opinion in part on what a different expert
> believes on the basis of expert knowledge not possessed
> by the first expert; and it is apparent from the
> wording of Rule 703 that there is no general
> requirement that the other expert testify as well.  The
> Committee Notes to the 1972 Proposed Rule 703 give the
> example of a physician who, though not an expert in
> radiology, relies for a diagnosis on an x-ray.  We too
> do not "believe that the leader of a clinical medical
> team must be qualified as an expert in every individual
> discipline encompassed by the team in order to testify
> as to the team's conclusions."  But suppose the
> soundness of the underlying expert judgment is in
> issue.  Suppose a thoracic surgeon gave expert evidence
> in a medical malpractice case that the plaintiff's
> decedent had died because the defendant, a radiologist,
> had negligently failed to diagnose the decedent's lung
> cancer until it was too advanced for surgery.  The
> surgeon would be competent to testify that the cancer
> was too advanced for surgery, but in offering the
> additional and critical judgment that the radiologist
> should have discovered the cancer sooner he would be,
> at best, just parroting the opinion of an expert in

radiology competent to testify that the defendant had
x-rayed the decedent carelessly. The case would be
governed by our decision in In re James Wilson
Associates, 965 F.2d 160, 172-73 (7th Cir. 1992), where
the issue was the state of repair of a building and
"the expert who had evaluated that state--the
consulting engineer--was the one who should have
testified. The architect [the expert who did testify]
could use what the engineer told him to offer an
opinion within the architect's domain of expertise, but
he could not testify for the purpose of vouching for
the truth of what the engineer had told him--of
becoming in short the engineer's spokesman."

                    *          *          *

The Daubert test must be applied with due regard for
the specialization of modern science. A scientist,
however well credentialed he may be, is not permitted
to be the mouthpiece of a scientist in a different
specialty. That would not be responsible science. A
theoretical economist, however able, would not be
allowed to testify to the findings of an econometric
study conducted by another economist if he lacked
expertise in econometrics and the study raised
questions that only an econometrician could answer. If
it were apparent that the study was not cut and dried,
the author would have to testify; he could not hide
behind the theoretician.

Little more really needs to be said. Dr. Silberberg's

deposition testimony has acknowledged his inability to comment on

Dr. Pasulka's report, not only as an ethical matter but also

because he is not equipped to do so professionally. Yet he goes

on to vouch for Dr. Hanlon's contrary opinion, even though, as

Dura, 285 F.3d at 613 posits, "the soundness of the underlying

expert judgment is in issue." As teed up by defendants, Dr.

Silberberg's report flunks the Daubert-Kumho gatekeeping test.

Motion 2 is granted.

9

<u>Motion 3 (Dkt. 137)</u>

Here too Scott seeks to bar the testimony of an opinion witness, R. Douglas Rhoads ("Rhoads"). According to Rhoads' Fed. R. Civ. P. ("Civ. R.") 26(a)(2)(B) report, he has concluded, and would expect to testify, as to the conduct of the detective defendants in this case:

> Their actions meet the standards as taught traditionally and are consistent with reasonable and appropriate law enforcement practices and training nationally.

Rhoads reaches that conclusion on the basis of his Summary of Facts, which reads like a brief written by defense counsel, accepting in its totality the version of events given by those detectives and all other pro-prosecution witnesses.

It is of course permissible for an opinion witness, in arriving at his or her conclusions, to premise that result on one side's view of contested events--as Magistrate Judge Jeffrey Cole said in <u>Richman v. Sheahan</u>, 415 F.Supp.2d 929, 942 (N.D. Ill. 2006):

> Experts routinely base their opinions on presumptions that are necessarily at odds with their adversary's view of the evidence.

In that way, if a factfinding jury then determines that the facts are in accordance with those assumptions, it can go on to decide whether to credit the opinions that rest on that foundation.

But here Rhoads has impermissibly flouted the definitive and controlling rejection of his above-quoted opinion by no less than

the Illinois Appellate Court. Here is the way in which that
court described Fassl's testimony in Scott's criminal trial
(People v. Scott, 366 Ill.App.3d at 286, 852 N.E.2d at 536):

> On cross-examination, Detective Fassl admitted that it
> was his goal to elicit a confession from defendant and
> that he was aware at the time of the investigation that
> there was no physical evidence or eyewitness accounts
> implicating defendant in Villalobos' murder. He stated
> that transporting defendant to the murder scene was an
> interview technique that he hoped would provoke
> defendant to confess and that he did not walk defendant
> through the apartment telling him what he had done.

And the court then found that Fassl's conduct (rather misconduct)
had rendered Scott's arrest illegal, so that Scott's subsequent
confession had been fatally tainted by the violation of his
Fourth Amendment rights--and in turn that Scott's conviction was
likewise fatally tainted.

In that light the Appellate Court, after conducting a
comprehensive review (1) of all the evidence in the case,
prosecution and defense alike, and (2) of relevant legal
authority, stated (id. at 290, 852 N.E.2d at 540 (citations
omitted):

> We lastly examine the purpose and flagrancy of police
> misconduct in affecting defendant's desire to confess.
> "Police action is flagrant where the investigation is
> carried out in such a manner as to cause surprise,
> fear, and confusion, or where it otherwise has a
> 'quality of purposefulness,' i.e., where the police
> embark upon a course of illegal conduct in the hope
> that some incriminating evidence (such as the very
> statement obtained) might be found." Such misconduct
> can include mistreatment of the defendant such as the
> deprivation of food, drink, and the opportunity to
> sleep.

11

                                      *            *             *

> Because the two key Brown factors militate against a finding of attenuation, we find that the circuit court erred in denying defendant's motion to suppress his statements to Detective Fassl and ASA Papa.  The use of an involuntary confession as substantive evidence of a defendant's guilt is never harmless error and requires reversal of any convictions obtained on such a basis. Accordingly, we reverse each of defendant's convictions and remand for a new trial in which defendant's statements will be suppressed.

All of this flatly contradicts Rhoads' opinion that Fassl's conduct--which violated Scott's federal constitutional rights--was "consistent with reasonable and appropriate law enforcement practices and training generally."  It is more than worth noting that Rhoads has not even included, among the case-related documents that he details as having reviewed en route to reaching his opinion, the decision of the Appellate Court. Indeed, all that he says on that score is contained in this brief snippet at the conclusion of his one-sided Summary of Facts:

> Scott was subsequently convicted of First Degree Murder and Armed Robbery.  Scott appealed his conviction and it was overturned.

Needless to say, Rhoads cannot set himself up as a super-appellate court entitled to overturn the state Appellate Court's legal reasoning and conclusion with a contrary opinion of his own.  That too flunks the Daubert-Kumho analysis, and Scott's Motion 3 is also granted.

12

<u>Motion 4 (Dkt. 138)</u>[3]

This time Scott's counsel challenges another proposed witness, Assistant State's Attorney James Papa ("Papa"), either by barring or by limiting his trial testimony. This time defendants have the better of the argument, subject to some qualifications.

Although Scott's counsel argues a lack of relevancy or, if not, that Papa's testimony "would be overly prejudicial and cumulative," that cannot be said as to what Papa asserts that he observed of Scott's appearance, demeanor and conduct--matters that the factfinding jury could view as bearing on Scott's claims regarding the treatment to which he was subjected and the effect on his physical condition. There are of course some plain qualifications on such testimony by Papa:

1. Just as the jury will not be permitted to hear Scott's confession, so any testimony by Papa in that area must be precluded.

2. Because Papa has not been identified as an opinion witness, nor has he prepared the Civ. R. 26(a)(2)(B) report required of such witnesses, he will not be permitted to offer any legal opinions or conclusions as to the propriety of defendants' actions.

---

[3] Defendants' response to that motion (Dkt. 159) contains a harmless typographical error, referring to it as Motion 2 rather than Motion 4.

3.    Even though Papa may testify as to his observation of such matters as whether Scott was sweating or evidenced other physical discomfort, Papa is not competent to take the next step or steps in stating, for example, whether Scott appeared to be going through heroin withdrawal.

4.    Because Papa met with Scott alone before the invalid confession was recorded, he may testify as to portions of his conversation with Scott during that time frame that pass muster in evidentiary terms.  That issue would seem to require taking into account the Illinois Appellate Court's ruling that held Scott's statements to Papa had to be suppressed due to the violation of Scott's constitutional rights--but neither side's counsel have spoken to that subject.

It is obvious that this Court's advance expression of views cannot anticipate questions in this area that may arise at trial. Hence Scott's Motion 4 is conditionally denied, subject to review as to individual matters that may arise at trial.

<u>Motion 5 (Dkt. 139)</u>

Here Scott seeks a ruling that a document reflecting a polygraph examination of Estella Gonzales (the woman who found the murder victim), conducted by Chicago Police Department Forensics Services Officer Robert Bartik ("Bartik"), is admissible in evidence.  Defendants' objections, advanced on

14

foundation and hearsay grounds, must be and are rejected.

As for the former objection, questions as to "foundation" may of course have a proper place in evidentiary determinations. But that does not support the overly pious proclamation by defense counsel in their Dkt. 164 Response at 1:

> A proper foundation is required by the rules of civil procedure, not by the defendants. Defendants have an absolute right to raise objections and they would be remiss if they did not.

It would be one thing if there were any suspicion that a document was bogus, or if for example there was some question about the chain of custody of some physical evidence (a drug sample, for example), or something of the sort. But it is frankly offensive for defense counsel to object to official police documents that defense counsel themselves provided to Scott's counsel.

If under those circumstances defense counsel were to insist that Scott's counsel must hale into court a witness to testify as to those documents that admittedly pose no real foundation problem, that demand might appropriately be viewed as "multipl[ying] the proceedings in a case unreasonably and vexatiously," so as to impose personal liability on defense counsel under 28 U.S.C. §1927. This Court has no desire to be heavy handed, but lawyers ought to exercise some sensible

judgment in interposing such objections.[4]

As for defense counsel's claimed hearsay objection, the Bartik-generated document itself is admissible because it is within the hearsay exceptions provided by both Evid. R. 803(6) and 803(8). And as for defense counsel's objection that the document contains an internal hearsay statement that is accordingly inadmissible, that position does not withstand analysis either.

On that score the asserted objection targets the document's inclusion of a plus sign (Bartik's symbol for an affirmative answer given by the subject of a polygraph examination) in response to the question "Did u stab Conrado?" But it is plain that the challenged entry sets forth a "matter[ ] observed pursuant to duty imposed by law as to which matter[ ] there was a duty to report," so it is expressly within the Evid. R. 803(8) exception to the hearsay rule.[5]

--------

[4] This Court's regular practice, during the course of its pretrial conferences that deal with proposed FPTOs, is to caution counsel that it expects any asserted foundation objections to be withdrawn substantially in advance of trial unless they are of the type indicated as permissible in the text. Eliminating needless witnesses in that respect serves the same goal that the Advisory Committee on the Rules of Evidence fostered during this Court's tenure as its chairman by adopting Evid. R. 902(11) to facilitate the authentication of documents without (again) needlessly calling witnesses for that purpose.

[5] Needless to say, that evidence is not to be considered for the _truth_ of that recorded response by Gonzales. Other evidence may certainly be admitted on that issue, including such matters (for example) as Bartik's recording of a minus sign (his

Thus neither objection to the Bartik report is persuasive. Scott's Motion 5 is granted.

## Motion 6 (Dkt. 140)

Scott's counsel "moves this Honorable Court to bar the Defendants from suggesting to the Jury that they could have legally held the Plaintiff for longer than 48 hours without a probable cause hearing, and also moves this Court to instruct the Jury regarding the legality of holding individuals arrested without a warrant or probable cause." Defense counsel's response (Dkt. 161) demonstrates persuasively that the motion is really premature, because its subject can best be addressed in the environment of trial, when the issues will have been sharpened and an informed ruling can be made. Accordingly Motion 6 is denied without prejudice.

## Motion 8 (part of Dkt. 141)

This motion seeks to bar photographs of the murder scene and of the murder victim's autopsy. Although defense counsel seek to resist the characterization of those photographs as "grotesque and...clearly intended to distract the Jury from the issues and to inflame its passions" (Scott's Mem. 1), the response (Dkt. 154 at 1-3) really glosses over what appears to be a lack of relevance, as well as failing to cope effectively with obvious

---

practice for showing negative responses) with respect to the question "Do u know who stabbed Conrado?"

Evid. R. 403 problems.

It should be remembered, as defense counsel themselves point out, just what the parties' dispute really comes down to--whether to credit the scenario testified to by Detective Fassl or the very different version of events by Scott, as summarized briefly this way by defense counsel (Dkt. 154 Response at 3):

> Plaintiff testified in his deposition he was told what to say in his confession by Detective Fassl. Plaintiff claims some of the "facts" given to him to confess included the number of times the decedent was stabbed, where on the body he was stabbed, the room where the murder took place, and what Plaintiff did after the stabbing.

That being so, nothing but a diversion (and an overly prejudicial diversion at that) would appear to be created by introduction of the disputed photographs--they make it neither more nor less probable that the version by one side or the other is credible. Motion 8 is therefore granted.

## Motion 9 (part of Dkt. 141)

Scott's counsel characterizes this motion as one "to Bar References to Arrests with no Conviction, to Convictions more than 10 years old, and to the Specifics of Prior Convictions other than the Charge, Date and Disposition of the Conviction." In response defense counsel disclaims any intention to offer such evidence "to show bad behavior, character or a propensity to commit crimes" (Dkt. 154 Response at 4), arguing instead that Scott's "prolific life of crime, however, is relevant to the

18

issue of lost income" and also "to his damages" (id.).

As for defense counsel's efforts to introduce evidence of Scott's prior arrests that did not lead to convictions, it is ironic how vigorously the selfsame defense counsel seek to call Evid. R. 404(b) and 403 into play when it comes to Scott's effort to bring into evidence other complaints ("CRs") against the police personnel who are named as defendants in this action.[6] Just what rulings defense counsel attempt to get from this Court seem to be a matter of whose ox is being gored, rather than a principled degree of consistency. In any event, arrests alone are regularly excluded under the two evidentiary rules cited in this paragraph, and so this Court will bar such evidence unless defense counsel come up with a better argument at trial.

As for criminal convictions, a limitation that would minimize (if not eliminate entirely) the risk that the factfinding jury could decide the case on a "bad man" basis rather than on the merits is the route that this Court will take. Evid. R. 609 will provide the standards for impeachment of Scott, and the same approach should suffice to allow the proper use of the same evidence for substantive purposes.

In summary, at this point Motion 9, as described in the capsule description quoted at the outset of this section, is

---

[6] That counter-effort by defense counsel forms part of defendants' motions in limine, to be dealt with in a later opinion.

19

granted. This ruling is potentially subject to refinement and particularized consideration at the time of trial.

### Motion 11 (part of Dkt. 141)

Scott testified in his deposition that he received a "bad conduct" discharge from the military some 28 years ago (!), resulting in his being confined to his barracks with a requirement of hard labor for some six months. Defense counsel urge that evidence of that fact should be admitted, once again because it is purportedly relevant to Scott's damages claim.

That strikes this Court as no better than a blatant effort to dirty up Scott in every conceivable manner--an effort that does no credit to defense counsel. Any incremental probative value that might arguably be ascribed to that evidence, if it were to be admitted in addition to Scott's criminal record that is _properly_ admissible under Evid. R. 609, is far outweighed by the unfair prejudice it would generate for Evid. R. 403 balancing purposes. Accordingly Motion 11 is granted.

### Motion 12 (part of Dkt. 141)

Scott's counsel describes this motion as one seeking "to Bar Suggestion that Plaintiff or Lori Ciesiun Were/Are Bad Parents due to their Drug Addictions/Habits." As so framed, that motion is granted in principle--but here, as with Motion 9, this Court would be prepared to take a fresh look at the potential use of evidence in that area as it may bear on the issue of damages (an

argument that is advanced in defendants' Dkt. 154 Response at 5-6).

## Motion 13 (part of Dkt. 141)

Scott's summary description of this motion is that it asks "to Bar Reference to Plaintiff Attempting Suicide with a Gun in 1999." Here too defense counsel trot out the oft-ridden "damages" horse as a ground for admissibility. In that respect defendants' response (Dkt. 154 at 6) refers in part to Scott's deposition testimony that he attempted suicide while incarcerated in Cook County Jail following his October 2000 arrest on the charge that gave rise to the current lawsuit.

In candor, the manner in which this issue has been posed by the parties "is a puzzlement" (as Yul Brynner put it in The King and I). Scott's earlier suicide effort[7] would bring into play the "eggshell skull" doctrine, under which an asserted tortfeasor takes the victim as he finds him (see, e.g., Lancaster v. Norfolk & W. Ry. Co., 773 F.2d 807, 822-23 (7th Cir. 1985)).

Thus if Scott's earlier attempt reflects a fragile mental state, so that he would be more susceptible to repeating the suicide effort in reaction to the trauma assertedly inflicted on him by defendants, that could potentially increase rather than

---

[7] In that regard this Court agrees with Scott's counsel that the method Scott employed--the use of a gun--is really irrelevant and, because of the potential for unfair prejudice, should be excluded under Evid. R. 403.

necessarily decreasing any recovery of damages.  In any case, the
fact of Scott's earlier attempted suicide appears to be relevant
if evidence as to Scott's October 2000 attempt is introduced into
the case.  Motion 13, except for the already-mentioned limitation
as to the means employed by Scott in 1999, is denied.

Motion 14 (part of Dkt. 141)

Here Scott moves "to Bar Suggestion that Plaintiff was
Violent while Under the Influence of Drugs or when going through
Withdrawal."  Defendants respond (Dkt. 154 at 8) that because
there is no evidence of a history of such violence, "it would be
inappropriate for Defendants to argue that any such history
existed, and Defendants have no intention of doing so in this
case."

But defendants then go on to discuss the potential
admissibility of Scott's drug use or withdrawal or both in
connection with the murder of Jesus Villalobos.  That however
suggests that the truthfulness or falsity of Scott's confession
would be played out before the jury, and it has already been
explained that such should not be the case--that instead that
subject is quite beside the mark.

So defense counsel have essentially conceded that Motion 14
should be granted as Scott's counsel has framed it.  Any other
potential uses of testimony in that area have not been
identified.  Motion 14 is indeed granted.

22

<u>Motion 15(a)(part of Dkt. 141)</u>

Scott attempts to keep out of the case any evidence about defendants' financial condition or their ability to pay damages. Defense counsel properly respond (Dkt. 154 at 10-11) that such evidence is relevant to the potential imposition of punitive damages (though Dkt. 154 at 10 states incorrectly that the motion "is contrary to the Seventh Circuit's pattern jury instructions on punitive damages").[8]

This of course is an issue that is regularly confronted by district judges. This Court has had occasion to speak to the issue in <u>Galvan v. Norberg</u>, No. 04 C 4003, 2006 WL 1343680, at *2 (N.D. Ill. May 10):

> Punitive damages pose a somewhat separate problem [from the general question of indemnification by the City of Chicago]. They do not of course create a right of indemnification, and once again it cannot be known what factors may enter into a jury's quantification of such damages if they are to be awarded. But defense counsel should be aware that if they plan to apprise the jury of the fact that the individual officers will have to bear such damages out of their own pockets, fairness would require that the jury also be informed of the true situation (indemnification) as to compensatory

---

[8] That pattern civil case instruction 7.24 includes, as a potential factor for jury consideration, "Defendant's financial condition." But that possibility is placed in brackets in the instruction, as to which the Committee Comments state:

> The bracketed factor concerning the defendant's financial condition should be given only if evidence was admitted on that topic.

Hence the pattern instruction reflects no view on the subject of admissibility vel non.

23

damages.

Accordingly Motion 15(a) is denied, subject to the possible exception identified in Galvan.

### Motion 15(b)(part of Dkt. 141)

On the flipside of the issue just discussed, Scott seeks "to Bar Reference to Plaintiff's Financial Condition."  Although defendants do not oppose that motion as such, their counsel contend correctly that they should be permitted to argue that Scott's motive for suing was to obtain money[9] and that factors that have contributed to Scott's financial condition (or lack of one) may bear upon the damages potentially awardable.  Even so, Scott's Motion 15(b) is granted as framed.

### Motion 15(d)(part of Dkt. 141)

This motion seeks (Dkt. 141 at 10) "to Bar Suggestion that a Particular Defendant should be found not Liable Because the Plaintiff does not Personally Know why he should be found Liable."  On that motion the parties are like ships that pass in the night.  Defense counsel contend that Scott should be subject to questioning "regarding who allegedly wronged him and the actions of each individual Defendant," while Scott's counsel complains of the unfairness of seeking to elicit from their lay client what amount to legal opinions on liability.

---

[9]  Just how that differentiates Scott from any other plaintiff suing for damages is somewhat mysterious.

24

As framed, Motion 15(d) is granted. Scott may of course be interrogated as to his contacts with each defendant and the asserted effect those actions had on him. It will then be left to counsel to argue the individual defendants' liability or lack of liability on legal grounds under appropriate jury instructions. Motion 15(d), as framed, is granted.

### Motion 15(e)(part of Dkt. 141)

Here Motion 15(e) asks "to Bar Suggestion that the Plaintiff Is Asking for more Compensation than he Expects to be Awarded." For reasons that this Court has difficulty in understanding, Dkt. 154 at 13-14 responds that such a motion is premature and should be denied--or alternatively that the ruling should be reserved until trial.

That response really makes no sense. Scott's counsel is not asking that defense counsel be precluded from arguing that the damages that Scott's counsel request at trial are excessive or that no damages should be awarded at all--as in every lawsuit, defense counsel are free to do that. That is quite different from the motion as framed, and it should be--and is--granted.

### Motion 15(g)(part of Dkt. 141)

Finally, this motion asks to bar any reference to how Scott's counsel is being compensated. Defense counsel disavow any intention to do so, but they intend to ask for a jury instruction that Scott's attorney's fees are not to be included

in any damages award.  This Court regularly includes such an instruction in Section 1983 cases.  As with other motions, Scott's Motion 15(g) is granted in the manner framed, although the jury instructions will include a provision to the effect just indicated.

### Conclusion

This will summarize the results of the extended analysis that has gone before:

1.  Motion 7 (part of Dkt. 141) has been withdrawn by Scott and is therefore moot.

2.  Without any objection on defendants' part, Motions 10, 15(c), 15(f) and 15(h)(all part of Dkt. 141) have been granted.

3.  Motions 2 (Dkt. 136), 3 (Dkt. 137), 5 (Dkt. 139) and 8, 11, 13, 14, 15(b), 15(d), 15(e) and 15(g)(all part of Dkt. 141) have been granted.

4.  Motion 1 (Dkt. 135) has been granted in part and denied in part, while Motions 9 and 12 (both part of Dkt. 141) have been granted in principle, subject to particularized consideration at the time of trial.

5.  Motion 6 (Dkt. 140) has been denied without prejudice, Motion 13 (part of Dkt. 141) has been denied in principal part, Motion 15(a)(also part of Dkt. 141) has been denied subject to a possible exception and Motion 4 (Dkt.

138) has been denied conditionally.

As stated at the outset of this opinion, this disposition of Scott's motions in limine enables this Court to proceed with defendants' motions.  Although this Court's prior commitments in other cases will delay that process somewhat, it is expected that the opinion will be forthcoming shortly.

_____

Milton I. Shadur
Senior United States District Judge

Date:  July 20, 2010

27