IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| LARRY SCOTT, ) | | |
|         Plaintiff, ) | | |
| v. ) | NO. | 07 C 3684 |
| ) | | |
| CITY OF CHICAGO, *et al.*, ) | | |
|         Defendants. ) | | |

**PLAINTIFF'S RULE 59 MOTION**

NOW COMES the Plaintiff, LARRY SCOTT, and, pursuant to Federal Rule of Civil Procedure 59, respectfully requests this Court for a new trial on damages, or, in the alternative for an *additur*. In support thereof, he states as follows:

**INTRODUCTION**

Following a week and a half long trial, and a full day of deliberations, the jury unanimously found that the Defendants maliciously prosecuted the Plaintiff. In finding that the Plaintiff was maliciously prosecuted, the jury necessarily found that the Defendants acted with malice towards the Plaintiff and that their malicious actions resulted in damages to the Plaintiff. Those damages, as articulated extensively during the trial, included six and a half years of incarceration in the Cook County jail as well as the Menard prison, along with severe continuing psychological problems for the Plaintiff.

The jury was instructed that it was to "…fairly compensate plaintiff for any injury that [it found] he sustained and is reasonably certain to sustain in the future as a direct result of the actions of the defendant or defendants…." (See Jury Instructions, Docket #204, attached hereto as Exhibit 1, p. 31). Despite this instruction, the jury awarded only $400,000 in compensatory damages to the Plaintiff. Given this award, the Plaintiff is entitled to a new trial on damages.

1

Courts order new trials on damages where, as here, a jury's award bears no rational relationship to the evidence in the record. In this case the compensatory award is far outside the realm of what could ever be considered a reasonable verdict (especially considering comparisons with reported verdicts and settlements in similar cases).

In addition, given the nature of the evidence regarding the damages suffered by the Plaintiff, the award is so patently insufficient that it must have been tainted by the Defendants' repeated appeals to prejudice in continuously stating and/or inferring that the Plaintiff was guilty of murder. No rational jury could have awarded the Plaintiff $400,000 for his damages, particularly since no defense was put on regarding damages, unless the jury accepted the Defendants' outrageous and recurring invitations to conclude that the Plaintiff was guilty.

## I. A NEW TRIAL ON DAMAGES IS REQUIRED BECAUSE THE JURY'S AWARD BEARS NO RATIONAL RELATIONSHIP TO THE EVIDENCE IN THE RECORD REGARDING THE PLAINTIFF'S DAMAGES.

In deciding post-trial motions, a District Court may grant a new trial, "…on all or some of the issues…for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). The Supreme Court has held that Federal Judges have the discretion, "…to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence." Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 2222 (1996). A verdict is against the weight of the evidence when, "…no rational jury could have rendered the verdict." Staub v. Proctor Hospital, 560 F.3d 647, 658 (7th Cir. 2009) (internal citation omitted).

As stated in the following excerpt, the Seventh Circuit long ago held that courts have a judicial obligation in ensuring that damage awards are neither excessive nor inadequate:

> Refusal to disturb the verdict of a jury or the judgment of the trial court thereon, when the amount is either grossly excessive or grossly inadequate, because the amount of damages

2

is for the jury to decide, is an avoidance of judicial responsibility. The rule is the same whether the case involves fees or awards in damage actions. The duty to act is as clear and as impelling in one case as in the other.

In re Albert Dickinson Co., 104 F.2d 771, 775 (7th Cir. 1939).

More recently, the Seventh Circuit has explained that a new trial on damages should be granted, "…when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Innogenetics, N.V. v. Abbott Laboratories, 512 F.3d 1363, 1374 (7th Cir. 2008); Davis v. Wisconsin Dept. of Corrections, 445 F.3d 971, 979 (7th Cir. 2006).

Federal courts across the country have long taken heed of their judicial responsibility and granted a new trial on damages when a compensatory damages award is deemed against the weight of the evidence due to its inadequacy. See, e.g., Roberts v. Williams, 456 F.2d 819 (5th Cir. 1971), *cert. denied,* 404 U.S. 866 (finding inadequate an $85,000 award to juvenile prisoner who was accidentally shot and injured); Phav v. Trueblood, Inc., 915 F.2d 764, 765, 768-69 (1st Cir. 1990) (affirming grant of a new trial on damages where lower court found that $5,000 award to man who lost the tips of two fingers in a work accident was so "parsimonious" as to be "outside the universe of possible awards"); Nunez-Santiago v. Puerto Rico Electric Power Authority, 206 F. Supp. 2d 234, 236 (D.P.R. 2002) (ordering new trial on damages after finding that $50,000 award to parents whose son sustained severe burns was grossly inadequate to compensate parents for their emotional suffering); Hammarskjold v. Fountain Powerboats, 782 F. Supp. 1032, 1034 (E.D. Pa. 1992) (ordering new trial because $27,127.12 was inadequate to compensate plaintiff for his pain and suffering resulting from a compression fracture; "an award for pain and suffering…need not be zero or [nominal] or a trivialization of the plaintiff's injuries in order to be inadequate"); Spell v. McDaniel, 604 F. Supp. 641 (E.D.N.C. 1985) (ordering a new trial on damages after finding that verdict of $1,000 in compensatory damages to excessive

3

force victim was "grossly inadequate"), *aff'd,* 824 F.2d 1380 (4th Cir. 1987); Bell v. Johnson, 404 F. 3d 997, 1003 (6th Cir. 2005) (upholding lower court's decision to grant plaintiff's motion for a new trial on damages where jury award of $1,500 to compensate prisoner was unreasonably low); Davis v. Smith, 638 F.2d 66 (8th Cir. 1981) (finding inadequate an award of $800 to a pre-trial detainee whose due process rights were violated when he was placed in a punishment cell).

In this case, since the damages awarded to the Plaintiff are based on the Illinois malicious prosecution claims, Illinois law governs the substantive assessment of the sufficiency of the damages awarded. See Naeem v. McKesson Drug Co., 444 F.3d 593, 611 (7th Cir. 2006) ("Because Ms. Naeem was awarded damages solely on her state-law intentional infliction of emotional distress claim, Illinois law governs review of that award."); McClain v. Owens-Corning Fiberglas Corp., 139 F.3d 1124, 1126 (7th Cir. 1998) ("Because Owens-Corning's liability is based on Illinois law, Illinois law governs the question of whether the evidence supports the award of damages."); Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., 106 F.3d 1388, 1397 (7th Cir. 1997) ("Illinois law governs the substantive assessment of whether the evidence supports the damages awarded when liability is based on Illinois law.").

Under Illinois law, a new trial on damages is proper where: "…the damages are manifestly inadequate or if it is clear that proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff." Hollis v. R. Latoria Const., Inc., 108 Ill.2d 401, 407, 485 N.E.2d 4, 7 (1985). A new trial on damages is also proper when "…the verdict resulted from passion or prejudice…." Gill v. Foster, 157 Ill.2d 304, 315, 626 N.E.2d 190, 195 (1993)[1].

---

[1] Federal review of compensatory damage awards is subject to a similar standard. Under Federal law Courts look at the following three factors in determining whether a compensatory damages award is proper: "…(1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases." Harvey v. Office of Banks and

A. <u>The Damages Awarded in this Case are Manifestly Inadequate, The Damages do not Include Proved Elements of Damages, and they Bear no Reasonable Relationship to the Plaintiff's Injuries</u>.

Awarding the Plaintiff $400,000 for six and a half years of wrongful imprisonment – an experience that continues to affect him to this day – is a result that is manifestly inadequate *and* clearly shows that the Plaintiff's proved elements of damages were ignored *and* that the jury awarded an amount that bears no relationship to the Plaintiff's loss. It is also an amount that, under the Federal factors (if they were applicable), bears no rational connection to the evidence *and* is an award that falls well below awards in comparable cases. Under either an Illinois or a Federal analysis, the damages award is so patently insufficient that the only fair course is to grant the Plaintiff a new trial on damages.

The Plaintiff testified the entire day on the second day of trial. Approximately 30 minutes of his testimony was under cross-examination (20 minutes of the cross-examination was devoted to the video confession). The remaining portion of that day was spent on direct examination. Of that portion of the trial, at least four hours (approximately two thirds to three quarters of the direct examination) of the testimony was devoted to the Plaintiff's damages.

The Plaintiff began by explaining to the jury the unspeakable horror that he experienced at the Cook County jail. It was a time where he had two choices: live in a small, windowless jail cell with accused murderers and rapists with nothing to do, or spend his time in the day room – a place where the gangs reigned supreme. The Plaintiff laid out, in excruciating detail, the environment of the Cook County jail. It was, and is, a place where he lived under the constant threat of physical attack and rape. It was a dangerous place where the Plaintiff was alone, with no friends, and no protection from the correctional officers – "officers" that were actually forcing

---

Real Estate, 377 F.3d 698, 713 (7th Cir. 2004). Clearly, the second Federal factor mirrors Illinois' "reasonable relationship to the loss suffered" factor .

the Plaintiff to break the law by making him deliver illegal drugs to other inmates. It was a place where the gangs openly operated a *brothel*. And, to add insult to injury, for almost three and a half years, the Plaintiff was at the Cook County jail with the death penalty hanging over his head.

The jury heard that the Plaintiff was cut off from his brother when he was in the Cook County jail – a circumstance that, the Plaintiff believed, led to his brother's death. That death is the source of never-ending guilt for the Plaintiff because he promised his mother at her deathbed that he would watch out for his older brother.

The jury also heard about how the Plaintiff lost his relationship with his son when he was at the Cook County jail. This was the ultimate injustice. The jury heard about the close and loving relationship that the Plaintiff had with his son. The relationship with his son was the only good thing in the Plaintiff's life. The Defendants' actions snatched the only positive aspect of the Plaintiff's life, and figuratively tossed it into the trash. The alienation in that relationship caused by the Defendants' malicious acts still impacts the Plaintiff's relationship with his son.

The jury also heard about the "existence" that the Plaintiff had at Menard prison – a place known as the pit, and best described as hell on earth. The Defendants' malicious actions caused the Plaintiff to be housed in that prison for three years. The Defendants' wrongful conduct resulted in the Plaintiff spending years confined in a cage under conditions that no human (certainly no American with constitutional protections) should be forced to wrongly endure. This included "living" in a cell for three years *that was only slightly bigger than the elevators in the Dirksen courthouse* for a minimum of twenty three hours a day, seven days a week, with a murderer as a cellmate, and only a foot and a half between the metal bunks and the wall.

While at Menard, the jury heard that the Plaintiff was in even more danger than he was at the Cook County jail. The prison population was filled with psychopaths, cannibals, and

murderers that believed that they had nothing to lose if they took a life – there was a moratorium on the death penalty in Illinois at the time and the prisoners knew that if they killed another inmate they would not be punished for it (since most of the inmates at Menard were already serving life sentences).

The Plaintiff testified that he suffered every imaginable deprivation when he was at Menard. The Defendants' malicious actions resulted in the Plaintiff literally living under the gun at Menard, all the while being deprived of the basic needs of a citizen of a civilized society (such as edible food, heat in the winter, minimum health care, etc.). The Plaintiff told the jury how he was stripped of every shred of liberty, privacy, and dignity while he was at Menard – all because the Defendants maliciously chose to institute baseless criminal proceedings against him. The jury also heard that, given Menard's geographical location, and the fact that he was convicted of murder, nobody visited the Plaintiff while he was "living" his personal hell at Menard – he was all alone, in a place that he could not even look another man in the eye for fear that doing so may be perceived as an insult.

The jury also learned about the Plaintiff's daily experience while he was at Menard. The Plaintiff's time at Menard was spent *literally staring at the wall* with nothing to read, and no access to a television or a radio to help him pass the time. The jury also learned that the Plaintiff had the privilege of spending eighteen months at Menard (out of his thirty-six month stay) on lockdown – a time when he was not allowed to leave his cage for any reason. The jury also learned that the Plaintiff once spent six consecutive months on lockdown.

To put this in perspective, our society would never stand for a dog owner confining a dog in a cage for six consecutive months. Yet, the jury concluded that three years of a human being wrongly caged in the fashion described by the Plaintiff – due to government officials' malicious

actions – is worth only a few thousand dollars a month. No rational jury would make this conclusion.

Basically, the Plaintiff's uncontradicted testimony informed the jury that his experience at Menard was as bad, if not worse, than the reported experiences of prisoners at the notorious Abu Ghraib prison in Iraq.

In addition, the jury also heard from the Plaintiff, as well as Dr. Pasulka, about the continuing effects of the malicious prosecution. The Plaintiff has not come to terms with his experiences, and is currently suffering from Major Depression (a condition that was directly caused by the malicious prosecution). His relationships are frayed and/or non-existent. The Plaintiff's son is stand-offish, at best – given that the Plaintiff's relationship with his son was so destroyed that the Plaintiff did not even recognize his son upon his release, it is not surprising that the Plaintiff cannot re-connect with his son. People view the Plaintiff as a murderer, despite the fact that the criminal charges were dismissed in a manner indicative of innocence. Put simply, the Plaintiff is a defeated man, hopeless, unwilling and unable to trust or have any intimate relationships – all because the Defendants chose to maliciously prosecute him.

Frankly, given the Plaintiff's uncontradicted testimony regarding his damages, it is a miracle that he has somehow managed to maintain his sanity.

The sum of $400,000 is absurdly inadequate (not merely manifestly inadequate), and clearly unreasonable, for even one year's worth of an experience testified to by the Plaintiff.

The Plaintiff's testimony regarding his pain and suffering was unchallenged – save for the insulting suggestion during his cross-examination that the Plaintiff was better off having been imprisoned. In addition, Dr. Pasulka's opinion that the Plaintiff now suffers from Major Depression due to the wrongful incarceration was not even cross-examined (the Defendants

instead chose to suggest during cross-examination that the Plaintiff was under the influence of heroin when Dr. Pasulka examined the Plaintiff).

The Defendants actually conceded the issue of damages entirely during the trial, and instead chose to put all their eggs in the liability basket (maintaining all the while, as pointed out below, that the Plaintiff was a murderer that got off on a technicality). The Defendants did not even discuss damages during closing arguments, or even suggest a proper award should the jury find the Defendants liable – except to, once again, insultingly suggest that Cook County jail and Menard were not such bad places since the Plaintiff was not physically harmed while imprisoned. At bottom, no argument can be made that the Defendants made any attempt, whatsoever, to legitimately minimize or mitigate the Plaintiff's damages.

The absurdly inadequate, and clearly unreasonable, compensatory damage award in this case is highlighted when verdicts and settlements in other comparable cases of wrongful imprisonment are examined. Analyzing comparable cases demonstrates that the damage award in this case in not merely unreasonably low, it is completely off the charts.

Courts across the country have recognized that one million dollars per year of wrongful imprisonment is a standard award. In Limone v. United States, 497 F. Supp. 143, 243 (D. Mass. 2007), *aff'd*, 579 F.3d 79 (1st Cir. 2009), for example, the Court summarized: "In recent years, both juries and courts sitting without juries have found that wrongfully imprisoned plaintiffs were entitled to compensation of at least $1 million per year." See also Smith v. City of Oakland, 538 F. Supp. 2d 1217, 1242-43 (N.D. Cal. 2008) (recognizing $1 million per year of incarceration as "a floor for wrongful imprisonment awards, not a ceiling," but finding award of $5 million for 4.5 months to be excessive, and remitting award to $3 million).

9

The Seventh Circuit has recognized that awards well in excess of a million dollars of compensatory damages per year of wrongful incarceration are appropriate – and has even ruled that awards that amount to several million dollars per year of wrongful incarceration are proper. For instance, less than a year ago, in Fox v. Hayes, 600 F.3d 819 (7th Cir. 2010), the Seventh Circuit held that $2.2 million dollars in compensatory damages was reasonable and appropriate for eight *months* of wrongful incarceration. The Fox case does not stand alone in the Seventh Circuit – a minimum of one million dollars of compensatory damages per year of incarceration has been endorsed by the Seventh Circuit in other cases. See, e.g., Newsome v. McCabe, 319 F.3d 301 (7th Cir.2003), *cert. denied*, 539 U.S. 943, 123 S.Ct. 2621 (2003) ($15 million in compensatory damages for malicious prosecution that resulted in 15 years of imprisonment was proper). In fact, in the last few years, reported verdicts and settlements in the Chicagoland area have affirmatively established that at least one million dollars in compensatory damages per year of wrongful imprisonment are appropriate[2]. See, e.g., Johnson v. Chicago, 05 C 1042 (plaintiff awarded $21,000,000 for eleven and a half years of wrongful imprisonment) (Cook County Jury Verdict report of jury verdicts, attached hereto as Exhibit 2); Huggins v. Chicago, 05 L 10791 (plaintiff awarded $1,500,000 for 15 months of wrongful imprisonment) (Exhibit 2); Finwall v. Chicago, 04 C 4663 (plaintiff awarded $2,025,000 for one year of wrongful imprisonment) (Exhibit 2); Dominguez v. Hendley, 04 C 2907 (plaintiff awarded $9,063,000 for nine years of wrongful imprisonment) (Exhibit 2); Rollins v. Chicago, 05 C 2532 (Chicago agreed to settle plaintiff's wrongful imprisonment claim for $9,000,000 due to plaintiff's eleven year long wrongful imprisonment) (Exhibit 2).

---

[2] There are numerous other examples of verdicts and settlements across the country, as well as in the Chicagoland area, where plaintiffs have received at least one million dollars per year of incarceration as compensatory damages. However, since the Illinois framework for damages analysis does not encourage looking at comparable cases, in contrast to the Federal framework, the Plaintiff is only citing a small sample of comparable cases.

As a result, given the evidence before the jury in this case, and in light of comparable awards/settlements, with the jury having found the Defendants liable to the Plaintiff for their malicious actions, the resulting verdict – awarding a few thousand dollars per month of wrongful incarceration – cannot stand. It is clear that, in this case, the Plaintiff should be granted a new trial on damages.

B. A Trial Solely on the Issue of Damages is Proper in this Case.

Although the substantive assessment of the propriety of the compensatory award looks to Illinois law, federal law alone determines whether a new trial solely on damages is proper. McClain v. Owens-Corning Fiberglas Corp., 139 F.3d 1124, 1128 (7th Cir. 1998). Under applicable federal law, "Partial trials are proper if 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Id.

In this case the damages flowing to the Plaintiff are clearly distinguishable from the liability aspect of the case. This particular case can be separated into two distinct issues – what the Defendants did to the Plaintiff at Area 2 (liability), and what the consequences of those actions are (Cook County jail, Menard prison, Major Depression, etc.). The first jury already found that the Defendants are liable to the Plaintiff due to their malicious actions. Thus, a second jury can be focused exclusively on the consequences of those actions.

There can be no legitimate argument that the liability and damages issues in this case are not distinct and separable. As such, a partial trial on damages is appropriate in this case.

C. In the Alternative, an *Additur* of at least One Million Dollars per Year of Wrongful Incarceration is Appropriate.

As pointed out extensively above, the damages awarded in this case are wholly inadequate, and fall well short of comparable awards in similar cases. An adequate award would

11

have awarded the Plaintiff, at a minimum, one million dollars for every year that he was wrongfully imprisoned (for a minimum award of $6.5 million dollars).

Both Federal and Illinois law allow for *additur* of a compensatory damage award in certain circumstances[3]. For instance, the Seventh Circuit has explained that if both parties consent *additur* may be appropriate. See Davis v. United States, 716 F.2d 418, 431 (7th Cir. 1983) ("[T]he Seventh Amendment forbids *additurs* in federal trials unless the plaintiff consents."). Similarly, under Illinois law, "Under the doctrine of *additur*, in appropriate cases the trial court may order a new trial based on the inadequacy of damages unless the defendant consents to an increase in the award of damages." Merrill v. Hill, 335 Ill.App.3d 1001, 1006, 783 N.E.2d 152, 156 (2nd Dist. 2002).

As such, in this case, should the Court be inclined to propose an *additur* in lieu of a new trial on damages, the Plaintiff respectfully recommends to the Court the benchmark figure of a minimum of one million dollars per year of wrongful incarceration.

## II. A NEW TRIAL ON DAMAGES IS APPROPRIATE BECAUSE THE DAMAGE AWARD REFLECTS THE INFLUENCE OF PREJUDICE.

The only way to make sense of the compensatory award in this case – an award which is so profoundly out of proportion to the undisputed evidence regarding the Plaintiff's damages and incalculable suffering – is that the jurors obviously believed that the Plaintiff, though the victim of malicious actions that resulted in his improper prosecution and incarceration, was nonetheless guilty of murder (and did not deserve a damage award commensurate with his actual damages).

To be sure, the Defendants did everything they could to suggest that the Plaintiff was guilty of murder. Before the trial began, the Plaintiff was ready and able to counter the improper suggestion of the Plaintiff's guilt. The Plaintiff was also prepared to explain to the jury – by way

---

[3] The result does not differ if Federal or Illinois law is applied with respect to the propriety of *additur* since, under either standard, *additur* is only appropriate conditionally.

12

of Dr. Ofshe – why innocent men falsely confess to heinous crimes such as murder. As demonstrated in the Plaintiff's offer of proof, the Plaintiff had ample evidence to present to the jury that he was actually innocent. (See Plaintiff's Offer of Proof, Docket # 199, attached hereto as Exhibit 3).

But the Plaintiff did not present this evidence because this Court repeatedly, and explicitly, instructed the parties to refrain from stating or inferring to the Plaintiff's guilt or innocence (and also because Dr. Ofshe was barred soon after he began testifying). The Defendants blatantly ignored the Court's rulings in this regard. In doing so the Defendants obviously succeeded in appealing to the jury's prejudice by convincing the jurors that the Plaintiff was guilty of murder. On this basis alone, the Court should grant a new trial on damages.

Simply put, the Court could not have been clearer. The parties were told before the trial began – at the Court's *voir dire* conference (as well as in the Court's motion *in limine* rulings) – that they were not to delve into the Plaintiff's guilt or innocence. The Plaintiff, to his detriment, faithfully adhered to this ruling throughout the trial.

Other than the Plaintiff's confessions (which the jury necessarily found were not credible since they found that the confessions did not supply the Defendants with probable cause to prosecute the Plaintiff), there was no actual proof of his guilt. Indeed, the *Defendants admitted that there was no physical or eyewitness evidence implicating the Plaintiff in the murder*.

Further, as the Plaintiff's offer of proof demonstrates (Exhibit 3), there was a wealth of evidence indicating that the Plaintiff was innocent. For instance, in his confession the Plaintiff stated that he stabbed the murder victim 2-3 times, but the medical examiner that conducted the post-mortem examination of the murder victim found that the victim had been stabbed at least 8

13

times (and had also suffered additional defensive wounds). (Exhibit 3). This is one example of the evidence contradicting – in a material respect – the suggestion that the Plaintiff was guilty of the murder. Evidence that, due to the Court's rulings, the jury never heard.

Instead, the jury heard the Defendants' repeated suggestions that the Plaintiff was guilty and that he got off on a technicality. Suggestions that were not only deliberate, but were not based in fact. The Defendants knew that there was no relevant, credible evidence that the Plaintiff committed the murder[4]. Yet, despite this knowledge, they charged ahead with their strategy – to convince the jury of the Plaintiff's guilt.

The Defendants' strategy resulted in numerous side bars and lengthy arguments on a daily basis rehashing the same tired arguments. The Defendants instituted the strategy during the opening statements, and continued with it through the closing arguments. For instance, the Defendants spent a great deal of time during the trial (with the Plaintiff, with Loretta Ciesiun, and during closing arguments) focusing on the Plaintiff's alibi – which was not relevant to anything other than the issue of guilt or innocence. The Defendants also continually stated that the confidential informant's tip was a credible tip that proved the Plaintiff's guilt (this was something the Defendants' did with numerous witnesses, as well as during the closing argument) – despite the Court's repeated insistence that the anonymous tip be properly characterized as being "discredited". The Defendants' closing argument even pointedly, and ostentatiously, highlighted the fact that the Plaintiff's first public defender did not testify for the Plaintiff – thereby leaving the jury with the impression that the public defender did not testify because he

---

[4] The Defendants' suggestion that the Plaintiff was guilty was not limited to the suggestion that there was actual, credible evidence that he committed the crime. The strategy also included the suggestion that innocent men do not confess to murder – a suggestion that Dr. Ofshe would have obliterated. Dr. Ofshe's exclusion, therefore, actually benefitted the Defendants' strategy – they were free to suggest that the Plaintiff was guilty *because* he confessed. The Plaintiff had no way of countering the suggestion. Dr. Ofshe, at a minimum, would have allowed the Plaintiff to inform the Jury that false confessions are real and that they occur in precisely the types of circumstances present during the Plaintiff's interrogation.

14

would have helped prove the Plaintiff's guilt. The Defendants' conduct was so outlandish in this regard that the Court took the unusual step of admonishing their counsel – in open Court – after the jury's verdict was read.

The repeated suggestions of the Plaintiff's guilt were not designed to elicit relevant information about the merits of the legal claims or the damages suffered. The suggestions were, clearly, meant to appeal to the jury's prejudice to not award any money to a murderer. Indeed, the suggestions were actually designed to instruct the jury to not fairly compensate a man that (according to the Defendants) got away with murder – regardless of the man's actual suffering. An instruction that, given the damages awarded, worked magnificently.

The Defendants' borderline contemptuous disregard of the Court's unequivocal rulings regarding the Plaintiff's guilt or innocence severely prejudiced – and materially hurt – the Plaintiff. Unfortunately, the Defendants' tactical gamesmanship during discovery (which the Court became well aware of during the trial) and the trial of this case was rewarded with a patently insufficient damage award.

The Defendants' improper appeal to the jury's prejudice, and brazen disregard of this Court's rulings, cannot be countenanced. The Plaintiff must be allowed a new trial on damages.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Plaintiff, LARRY SCOTT, respectfully requests this Court for a new trial on damages, or, in the alternative for an *additur*.

Respectfully submitted by,
s/Basileios J. Foutris
BASILEIOS J. FOUTRIS
Attorney for Plaintiff
53 W. Jackson, Suite 252
Chicago, Illinois 60604
(312) 212-1200
bfoutris@foutrislaw.com

## CERTIFICATE OF SERVICE

The undersigned, attorney of record herein, hereby certifies that on January 12, 2011 the foregoing **PLAINTIFF'S RULE 59 MOTION** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, along with judge's courtesy copies being delivered; which will send notification of such filing to: Arlene Esther Martin at amartin@cityofchicago.org, Matthew Raymond Hader at matt.hader@cityofchicago.org, Anne Katherine Preston at apreston@cityofchicago.org; George John Yamin, Jr. at gyamin@cityofchicago.org; Andrew Hale at ahale@ahalelaw.com; and Avi Kamionski at akamionski@ahalelaw.com.

                                                s/ Basileios J. Foutris
                                                BASILEIOS J. FOUTRIS
                                                Attorney for Plaintiff
                                                FOUTRIS LAW OFFICE, LTD.
                                                53 West Jackson, Suite 252
                                                Chicago, Illinois 60604
                                                312-212-1200
                                                bfoutris@foutrislaw.com